(No. 21223.—)

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* RUSSELL ROBERT McWILLIAMS, Plaintiff in Error.

*Opinion filed April 23, 1932.*

KNIGHT, PENNY & LUPTON, (THOMAS F. RYAN, of counsel,) for plaintiff in error.

OSCAR E. CARLSTROM, Attorney General, WILLIAM D. KNIGHT, State's Attorney, J. J. NEIGER, ALFRED B. LOUISON, and MAX A. WESTON, for the People.

Mr. Justice Jones delivered the opinion of the court:

In the circuit court of Winnebago county Russell Robert McWilliams was sentenced to death upon a plea of guilty for the murder of William Sayles. On August 29, 1931, the date of the homicide, McWilliams was seventeen years and eleven days old. The plea of guilty was entered October 26, 1931, and two days thereafter the presiding judge heard evidence in aggravation and mitigation of the crime, at the conclusion of which a judgment fixing the death penalty was entered. The cause was brought to this court by writ of error.

The errors assigned do not question the guilt of the defendant but challenge the manner and method of the trial judge in conducting the hearing in aggravation and mitigation of the offense. They also challenge the discretion of the court in imposing a sentence of death. In view of the fact that the guilt of the defendant is admitted, only a brief statement of facts concerning the commission of the crime is necessary.

About 11:15 P. M. a street car stopped at the intersection of two streets in the city of Rockford to discharge passengers. After the car started a person was seen running alongside it, hailing the motorman. The car stopped again and the defendant boarded it. He drew from his pocket a gun and pointed it at the motorman, William Sayles. With an oath he demanded the motorman to give up his money. The demand was complied with. The motorman was ordered to the rear of the car, and then the defendant demanded and received the money possessed by the seven or eight passengers, who were also compelled to go to the rear. When he was ready to leave he made the passengers and motorman take the places originally occupied by them. He took some "slugs" from the motorman's hand and threw them to the floor. He pulled the cap off the motorman and threw it down. As he stepped off the car the motorman struck at him, and then the defendant fired five

shots into the body of the motorman, who soon died. The defendant left the car and ran down the street, firing one or two shots into the air. The testimony tends strongly to show that he was under the influence of liquor at the time and immediately after the killing.

In all cases where a party pleads guilty and where the court possesses any discretion as to the extent of the punishment it is the duty of the court to examine witnesses as to the aggravation and mitigation of the offense. (Crim. Code, div. 13, sec. 4.) In this State there are no degrees of murder, but whoever is found guilty of that crime must suffer the punishment of death or imprisonment in the penitentiary for his natural life or for a term not less than fourteen years. Therefore, in this case the presiding judge was vested with discretionary power either to impose a sentence of death, or imprisonment in the penitentiary for life, or for a definite term not less than fourteen years. It is the declared legal policy of this State to require a judge having any discretion over punishments to conduct an inquiry before he shall sentence one who has entered a plea of guilty. This requirement is in the nature of a privilege accorded to the State that it may show aggravation, and to the defendant that he may show circumstances in mitigation. This right may be waived by the parties, (*People* v. *Pennington,* 267 Ill. 45; *People* v. *Gerke,* 332 id. 583; *People* v. *Crooks,* 326 id. 266,) but in the absence of a waiver the court should not fail in its duty to conduct a hearing. In murder cases, especially, this obligation is of the highest importance because of the exceeding latitude allowed the court. The spread between a sentence of fourteen years and a penalty of death is so vast that a judge should not impose the extreme penalty except after a hearing and serious consideration of the surrounding facts and circumstances which may tend towards aggravation or mitigation of the offense. The examination of witnesses for this purpose does not constitute a trial in the ordinary sense of the word. The

hearing is not for the purpose of determining guilt or innocence but has for its sole object the determination of the degree of punishment of the prisoner in the light of the circumstances surrounding him. (*People* v. *Popescue,* 345 Ill. 142.) In deciding this question the court is not confined to the evidence showing guilt, for that issue has been settled by the plea. The rules of evidence which ordinarily obtain in a trial where guilt is denied do not bind the court in its inquiry. It may look to the facts of the killing, and it may search anywhere, within reasonable bounds, for other facts which tend to aggravate or mitigate the offense. In doing so it may inquire into the general moral character of the offender, his mentality, his habits, his social environments, his abnormal or subnormal tendencies, his age, his natural inclination or aversion to commit crime, the stimuli which motivate his conduct, and, as was said in *People* v. *Popescue, supra,* the judge should know something of the life, family, occupation and record of the person about to be sentenced. Fixing the extent of punishment for crime has not, and probably never can have, a definite scientific or philosophical basis. In the time of Sir William Blackstone there were one hundred and sixty crimes punishable by death. In this country one jurisdiction may provide no other punishment than death for murder. Another jurisdiction may not permit the death penalty at all. In one State the penalty is by hanging; in another by electrocution. In Illinois both methods have been employed, but when the penalty is not fixed at death it ranges from imprisonment for the full length of the defendant's life to as little as fourteen years.

The pertinent question in this case is whether or not the sentence of death imposed by the court was entered after a substantial compliance with the spirit of the law. The defendant pleaded guilty and asked for a hearing on the question of the extent of his punishment. He therefore waived nothing, and was entitled, as a matter of right, to a hearing of such character and understanding as befitted the situ-

ation in which he was placed. He was but seventeen years of age, and while the law made him as fully answerable for his crime as though he were an adult of seasoned perception and experience, nevertheless the fact of infancy has always made persons of his age the objects of tender consideration and mercy when penalties are to be imposed.

The proceedings to determine the penalty which this defendant should pay for his crime are criticised. Witnesses were produced by the State who disclosed every detail immediately connected with the robbery, the killing and the circumstances of his flight. It was shown that when he was fifteen years of age he and another boy broke into a house and stole some guns and other articles. He was found guilty of that offense but was released on probation. It was shown that he had once been charged with stealing an ice-cream disher but was released without trial. After his arrest on the charge of murder several indictments for other offenses were returned against him, to each of which he entered a plea of guilty. The indictments and the pleas were not offered in evidence, but the court announced that it would take judicial notice of such indictments and pleas because they were part of the proceedings of the present term of that court. Whether the indictments related to offenses committed on the night of the killing we do not know, but under the authorities all of these things could properly be shown in aggravation of the offense for which the defendant was about to be sentenced. It is clear that everything thus disclosed tended only to show aggravation and to justify a severe penalty.

For the purpose of showing mitigation or extenuation of his crime the defendant took the witness stand and his counsel stated to the court: "The defendant is in the chair, and we now offer to the court or the State's attorney the privilege of asking him any questions that they may desire in order to throw any further light that might be necessary for the purpose of this particular case and hear-

ing." The court responded, "I do not think the court cares to ask any questions." Thereupon counsel for the People began an interrogation about the housebreaking and also about the stealing of an ice-cream disher above referred to. Not one question was asked the defendant concerning the murder charge. During the hearing the State's attorney placed upon the table, in the presence of the court, a number of guns. There was no effort made to identify them as having played any part in the tragedy or as having been associated with any of the other alleged crimes of the defendant. His counsel objected to the display, and the objection was sustained by the court with the remark that "the court can assure counsel that there is no harm done by it." It is apparent that no good could come from such a display of dangerous weapons. It was calculated to prejudice the rights of the defendant and must have been made for that purpose.

The defendant had been steadily employed for about two years at a wage of $20 a week. He had turned over his pay checks to his mother to be used toward the family expenses, but when it was sought to develop this matter by showing how the money was used the court sustained an objection to the question. The boy's habits with reference to industry and frugality, his domestic relations and his sense of obligation to his parents were of vital importance to him at so critical a time, and it was error for the court to deny or abridge his right to show what they were. The record is silent concerning an investigation of the essential matters of inquiry mentioned in the *Popescue case*. Questions relating to where he was born, how he was reared, what were the family conditions, how he had been occupied and what influences for good or evil had surrounded him were not referred to. It is true that as to some of these things he made no offer of proof. In this respect he was delinquent, but in a matter of such importance to a defendant so young and of such serious moment to our social

organization, humane principles demand that the inquiry shall be so conducted that the court may be put in possession of sufficient facts to enable it to exercise a sound and understanding discretion concerning the degree of punishment to be inflicted.

The conduct of the inquiry did not answer the mandate of the statute, and for that reason the judgment, so far as it inflicts the death penalty upon the defendant, is reversed and the cause is remanded, with directions to the court to re-open the hearing and conduct it in conformity with the views here expressed.

*Reversed and remanded, with directions.*