THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. OTIS D. ISEMINGER, JR., Defendant-Appellant.

Fourth District    No. 4—89—0629

Opinion filed September 13, 1990.

582

KNECHT, P.J., specially concurring.

Steven Skelton, of Bloomington, for appellant.

Charles G. Reynard, State's Attorney, of Bloomington (Kenneth R. Boyle, Robert J. Biderman, and Timothy J. Londrigan, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE STEIGMANN delivered the opinion of the court:
This appeal presents the question of whether, and to what extent, the trial court at a sentencing hearing may *sua sponte* question a defendant who has neither testified at that hearing nor exercised his right of allocution.

## I. THE FACTS

### A. *Defendant's Guilty Pleas*
In July 1988, defendant, Otis D. Iseminger, Jr., was charged with driving under the influence of alcohol (DUI) (Ill. Rev. Stat. 1987, ch. 95½, par. 11—501(a)(2)) based upon his driving a van while allegedly drunk on July 2, 1988. In March 1989, defendant was charged with felony DUI (driving under the combined influence of alcohol and drugs) (Ill. Rev. Stat. 1987, ch. 95½, pars. 11—501(a)(4), (d)(3)), after causing an automobile accident in September 1987 in which his son was killed. In June 1989, defendant pleaded guilty to both charges pursuant to a plea agreement which provided for a sentence of 1½

years in the Department of Corrections on the felony conviction and 270 days in jail on the misdemeanor conviction, with the sentences to run concurrently.

### B. *Information Contained in the Presentence Report*

Pursuant to court order, a presentence investigation was conducted and a presentence report prepared for the sentencing hearing scheduled for August 1, 1989. The presentence report revealed that defendant, in addition to the felony and misdemeanor DUI convictions for which he was to be sentenced, had the following criminal record: a 1976 conviction for conspiracy to commit armed robbery, sentenced to 48 months' probation with 5 months in jail; a 1983 DUI adjudication, sentenced to 12 months' supervision and fined $150; and a 1985 DUI conviction, sentenced to 30 days in jail.

The presentence report also stated that defendant was a 35-year-old male, employed as a house painter on a regular basis since 1972.

Defendant was first married in 1973 and was divorced in 1976. One child was born of that marriage, but defendant has not made any child support payments to his first wife.

In 1982, defendant married Denise Williams, and two children, Kris and Nicole, were born of that marriage. Defendant told the probation officer who prepared the presentence report that he and Williams were separated. However, they had been formally divorced in McLean County 16 months earlier at a proceeding where, according to Williams, defendant was present at the courthouse, but refused to enter the courtroom in which the divorce proceedings were taking place. Defendant also told the probation officer that he was giving Williams $50 a week to help support Nicole.

Defendant reported to the probation officer that at the time of the presentence investigation, he was not consuming "any type of alcohol or us[ing] any other type of drug." He stated that he had used alcohol in the past and that it had caused him problems. Defendant further indicated that he might have a need for treatment.

The felony offense for which defendant was to be sentenced resulted in the death of his 7½-year-old son, who was in the van defendant was driving. The presentence report described that accident as follows:

> "On September 13, 1987, Officer O'Shea of the McLean County Sheriff's Department was dispatched to a personal injury accident involving the Defendant, Duane Iseminger.
>
> Officer O'Shea observed Mr. Iseminger in a disoriented state, moving about with quick[,] frantic movements and speak-

ing in a rapid and disjointed manner. Officer O'Shea noticed that the Defendant had very bloodshot eyes with dilated pupils. He also noticed that Iseminger had the strong odor of an alcoholic beverage on his breath.

While conducting an inventory of the Defendant's vehicle, Officer O'Shea found a pipe that had the smell of fresh burnt cannabis and an open can of beer.

Based on the observation of the Defendant's behavior and the search done on his vehicle, Mr. Iseminger was placed under arrest."

After his arrest for this offense on September 13, 1987, defendant was jailed for 81 days, until December 2, 1987. On July 2, 1988, seven months to the day after defendant's release from custody on the charge of drunk driving in which he killed his 7½-year-old son, defendant was again arrested for DUI, the misdemeanor offense for which he was to be sentenced on August 1, 1989, at the same time he was to be sentenced on the felony DUI. The presentence report regarding the misdemeanor DUI stated the following:

"On July 2, 1988, Officer David G. Stephens was on patrol and observed a red van traveling half in its lane of traffic and half in the parking spaces, crossing over a double yellow center line three (3) times, and making a left turn and not signaling. Having reasonable cause, Officer Stephens stopped the vehicle which was being driven by the Defendant, Mr. Iseminger.

While talking with Mr. Iseminger, Officer Stephens could smell a strong odor of alcohol, his eyes were bloodshot, and he was swaying. Officer Stephens asked the Defendant to do the one leg stand, walk and turn test, and the finger to the nose test. While taking the tests the Defendant could not keep his balance or follow instructions. Officer Stephens also checked Mr. Iseminger for Nystagmus in which he had no smooth pursuit and had Nystagmus at maximum deviation. At this point Mr. Iseminger was placed under arrest."

Fortunately, at the point defendant was stopped by Officer Stephens, he had not yet killed anyone.

### C. The "Victim Impact" Statement

The presentence report, which was filed on July 28, 1989, was made available to the court and both counsel in advance of the sentencing hearing. A few minutes before the sentencing hearing began, the court provided both counsel with a 17-page "Victim Impact Statement" prepared by Williams that the court had received as a supple-

ment to the presentence report. In that statement, Williams expressed great bitterness and anger at defendant for causing the death of their son. She wrote the following:

"[I]n our divorce, [defendant] was order[ed] to pay child support of $50.00 weekly which I've only received $500 maybe and mom [Ms. Williams' mother with whom she and Nicole had been living] only $100.00 since May of 1988. So he is $2,400.00 behind since our divorce and never bother[ed] to help support Nicole from the time we separated til [*sic*] our divorce. \*\*\* Now [defendant's] reason for not paying support is because he needs his money for beer! \*\*\* All his beer does is depress him and he tries to blame me for the accident! I am not the one who partied all week-end instead of being with my children like he was supposed to. I had never allowed Kris to stay in Heyworth [the home where defendant was living at the time of the accident] because of [defendant's] drinking and there [*sic*] life style and indecent home. That was the first time in seven years and nine months that I ever allowed either of my children to stay [overnight with defendant].

\*\*\* [W]e are stuck with [defendant] never willing to help or pay for his damage. \*\*\* He is much to [*sic*] busy drinking to even put down the [b]ooze and [d]rugs for a day with his only daughter \*\*\*."

### D. *The Sentencing Hearing*

At the August 1, 1989, sentencing hearing, all of the foregoing information was before the judge.

At the beginning of the sentencing hearing, the court appropriately inquired of the parties whether they each had had an opportunity to review the presentence report. The parties said that they had. Defense counsel further acknowledged that he had reviewed the presentence report with defendant, and neither he nor defendant had any corrections or objections he wished to note. The court also inquired and was told that neither party had any objection to the admission into evidence of the 17-page victim statement. Neither the State nor the defense offered any evidence in aggravation or mitigation, and the defendant chose not to exercise his right of allocution.

In this context, the following dialogue then took place in response to the court's questions:

"THE COURT: [Defendant,] [y]ou know more about the facts than anyone here in the courtroom this morning. Do you have any questions or comments you want to make in your own be-

half?

THE DEFENDANT: No, sir.

THE COURT: In the report on page four it indicates that you told the probation officer that you and your wife are currently separated and you're giving her $50 a week to support Nicole. Is that true? You need to answer out loud, sir.

THE DEFENDANT: Yes, sir.

THE COURT: How many times have you paid that $50.

THE DEFENDANT: Quite a few times. I might be behind, but—

THE COURT: You're behind quite a bit, aren't you?

THE DEFENDANT: Well recently I—

THE COURT: Have you—Is the child staying now with the grandmother? You need to answer out loud, sir.

THE DEFENDANT: Yes.

THE COURT: Are you paying child support to the grandmother?

THE DEFENDANT: I haven't paid no—I haven't.

THE COURT: In other words you've paid two of those, isn't that right? You need to answer out loud, Mr. Iseminger.

THE DEFENDANT: Yes.

THE COURT: The child's been with the grandmother for how long?

THE DEFENDANT: Off and on.

THE COURT: For a number of weeks?

THE DEFENDANT: Yes.

THE COURT: In essence, you're not supporting your child, is that correct? The remaining child that is alive?

THE DEFENDANT: No, I'm not, but I can't.

THE COURT: Why not.

THE DEFENDANT: Because I don't think the mother needs the money. I gave it to her mother.

THE COURT: That's not the issue. You're under a Court order to pay it, aren't you?

THE DEFENDANT: Yes.

THE COURT: And you're violating that Court order on a weekly basis, isn't that right?

THE DEFENDANT: Yes.

THE COURT: Where did you obtain the cannabis that you were, that was found in the van that evening? Where did you get it?

THE DEFENDANT: There was none found in the van.

THE COURT: There was some found in a pipe in the van. According to the police officers' reports.

THE DEFENDANT: It's been there for a long time. I—

THE COURT: It smelled like it was freshly burned, Mr. Iseminger.

THE DEFENDANT: No way. It was the night before.

THE COURT: You're denying—And where did you get the cannabis the night before?

THE DEFENDANT: Through a friend.

THE COURT: Who?

THE DEFENDANT: Kathy Mcomes.

THE COURT: How do you spell the last name?

THE DEFENDANT: M-c-o-m-e-s. Whatever.

THE COURT: When's the last time you had any alcohol to drink?

THE DEFENDANT: Yesterday.

THE COURT: You continue to drink alcohol?

THE DEFENDANT: Once in a great while. Yesterday I did.

THE COURT: What did you have to drink yesterday?

THE DEFENDANT: Some beer.

THE COURT: How many?

THE DEFENDANT: Four or five.

THE COURT: When's the last time before that?

THE DEFENDANT: Probably a week ago.

THE COURT: Do you have any other comments?

THE DEFENDANT: No, sir.

THE COURT: I notice that you graduated from high school in 1972 and you've maintained employment for the last seven years.

THE DEFENDANT: Yes, sir.

THE COURT: Pre-sentence report does not appear to be accurate when you told the probation officer you didn't consume alcohol or drugs. That's not correct, is it?

THE DEFENDANT: No. I had stopped for a while.

THE COURT: When?

THE DEFENDANT: Oh, three or four months ago, I stopped for a long time.

THE COURT: For a week or two?

THE DEFENDANT: Yeah.

THE COURT: That's not a long time, Mr. Iseminger.

THE DEFENDANT: Well, to me it was.

THE COURT: When's the last time you consumed drugs?

MR. SKELTON: Judge, I'm going to interpose an objection at this point in time. Mr. Iseminger is not testifying. He has made no comments in allocution. I would object to the questions that the Court has interposed at this time.

THE COURT: Objection will be noted for the record, and overruled.

MR. SKELTON: I am instructing my client not to answer any further questions.

THE COURT: Mr. Iseminger, you will either answer the questions of the Court or I will find you in contempt of Court. Now Mr. Skelton can admonish you in any way he wishes. You need to understand that you're required to answer questions of the Court. Now Mr. Skelton, if you want to discuss it with him, that's fine.

MR. SKELTON: I would like to confer with my client.

(WHEREUPON conference was held between Mr. Skelton and the defendant in the conference room and off the record, after which the following proceedings were had:)

THE COURT: Record reflect that Mr. Skelton and his client have returned to the courtroom. Mr. Iseminger, when is the last time you consumed cannabis or any other illegal drugs?

THE DEFENDANT: I have to refuse to answer by my lawyer here.

THE COURT: No, sir, you don't have to. That's your choice. But you understand that you can be held in direct criminal contempt of this Court and sentenced to jail up to six months or held in direct civil contempt of Court and sentenced to jail until you do answer. And you can stay in jail until you do answer, no matter how long it takes. You understand that?

THE DEFENDANT: I understand that.

THE COURT: When's the last time you consumed an illegal substance, drug, cannabis, or other illegal substance?

THE DEFENDANT: I refuse to answer that.

THE COURT: I'm sorry?

THE DEFENDANT: I refuse to answer that.

THE COURT: All right. The Court will find you in direct civil contempt of this Court, sentence you to the custody of the McLean County Sheriff until you answer the question. Do you have any questions?

THE DEFENDANT: (Nodded head.)

MR. SKELTON: At this point in time, your Honor—

THE COURT: All right. You're remanded to the custody of

the Sheriff.

MR. SKELTON: I would ask to surrender Mr. Iseminger on the bonds earlier posted in these causes.

THE COURT: I'm sorry, I didn't hear you, Mr. Skelton.

MR. SKELTON: I would ask to surrender Mr. Iseminger on the bonds that were earlier posted in each of these causes.

THE COURT: He's not in custody on these causes. He's in custody for direct civil contempt of this Court.

MR. SKELTON: I understand that, your Honor. I am moving to surrender Mr. Iseminger at this point in time and do away with the bonds earlier posted.

THE COURT: State have any comment?

MR. BEYER: I would take no position, your Honor.

THE COURT: All right. The Court will order the defendant surrendered on the bond, with bond to be retained by the Clerk until the conclusion of these matters.

MR. SKELTON: Further ask the Court to recuse itself under the circumstances.

THE COURT: I'm going to decline to recuse myself. There is no occasion to do that at this point. Defendant remanded to the custody of the Sheriff. Mr. Iseminger, you need to understand that at any time you wish to answer the questions of the Court you can indicate that to the staff or through your counsel, to the staff, and be brought back to Court and conclude the sentencing hearing. [A]ll right. You're remanded to the custody of the Sheriff."

### E. *The Order of Direct Civil Contempt*

On August 4, 1989, the trial judge filed a written order of direct civil contempt, which stated in pertinent part as follows:

"4. That the Trial Judge commenced to inquire of the Defendant personally with regard to several issues raised by the Presentence Investigation Report prepared in said cause and the seventeen page statement of the mother of the deceased son of the Defendant which was received into evidence in the manner of a victim's statement without objection[.]

\* \* \*

7. That the Defendant continued to refuse to answer the Court's question[,] thus depriving the Court of valuable relevant information upon which to predicate the Court's sentencing responsibility.

8. That the conduct of the Defendant \* \* \* deprived the

Court of valuable relevant information necessary for the Court to be able to exercise its judicial discretion in the matter of determining an appropriate sentence to be imposed in the within cause[.]

9. The inquiry of the Court was particularly relevant and necessary in this cause as the \*\*\* offense for which the Defendant was being sentenced and for which the Court was being asked to exercise its judicial discretion by imposing an appropriate sentence, was the offense of Driving under the Influence of Alcohol or Drugs which occurred at a time when the Defendant was involved in a vehicle accident which resulted in the death of his minor child[.]"

The court concluded its order by declaring the defendant to be in direct civil contempt of court and by ordering him incarcerated in the McLean County jail until he purged himself of that contempt by answering the questions of the court. The court further ordered that defendant not be surrendered on bond in the underlying cases upon which he was to be sentenced, thereby depriving defendant of credit on any sentence subsequently imposed in the criminal cases for time served in jail on direct civil contempt.

### F. The Proceedings on the "Motion to Require Hearing"

On August 4, 1989, three days after the sentencing hearing, defendant filed a document entitled, "motion to require hearing." In that motion, defendant, *for the first time*, claimed that he was entitled under the fifth amendment to remain silent at the sentencing hearing. Pursuant to that motion, a hearing was conducted on August 7, 1989, before the same judge who presided at the aborted sentencing hearing on August 1. At this hearing, the court observed that defendant had ample opportunity at the sentencing hearing to indicate to the court any reasons for his failure to answer the court's questions, noting in particular the opportunity defendant was given to confer with his privately retained counsel, whom the court described as "an experienced criminal trial attorney." Even after this conference, the court noted, defendant and his counsel failed to proffer any explanation for the defendant's refusal to answer the court's inquiry, except the statement that because defendant had chosen neither to testify nor to make any statement in the exercise of his right of allocution, the court had no right to inquire of defendant to seek additional information. The court found no basis in the law for this assertion and maintained that its inquiry was "particularly necessary and potentially enlightening." The court made the following additional

statements:

"[T]he Court had before it two directly contradictory pieces of evidence, one being the five-page pre-sentence report prepared by the Court's probation officer, which consisted largely or was based largely on the basis of defendant's voluntary statements to the Court's probation officer; and second, the Court had a seventeen page letter in the nature of a victim impact statement from the mother of the deceased seven and a half year old child who was killed at the time he was a passenger in the vehicle the defendant was driving, while the defendant was under the influence of alcohol and illegal drugs, the charge [for] which the defendant is being sentenced or was in the process of being sentenced at that time. *** The Court's questions were directed almost exclusively to the contradictions I perceived in the two documents, one being the frequency of the defendant's payment of child support for his surviving daughter. The defendant suggested that he was current in his payments in the probation report and in his statements to the probation officer as reflected in that report. The mother, in her letter or statement, indicated that those payments were infrequent at best ***. Second, the frequency of the defendant's consumption of alcohol since the accident. Defendant told the probation officer, as reported in the probation pre-sentence investigation report he had consumed none, or that he was in the process of consuming none. The mother in her statement suggested that it was frequent and on-going, not just alcohol, but drugs. After several questions, the defendant essentially admitted to the Court that her statements were more accurate, that he had not told the truth to the probation officer. It seems to me that evidence is extremely relevant and important regarding the issue of the defendant's potential rehabilitation. With regard to each of these subjects, the defendant had not told the Court's probation officer the truth regarding these matters, a fact discovered in Court by the Court's questioning of the defendant."

At this point in the trial judge's explanation, defense counsel interrupted to state an objection to the conclusions that the court had drawn, stating:

"If there's [sic] contradictory indications in one document as opposed to the other, I don't think the Court can reach a conclusion based on that alone."

In response to this objection, the court stated the following:

"Well, that's what I was asking the defendant to respond for.

Finally, the Court inquired of the defendant's on-going use of illegal drugs. The defendant refused to answer, and in the Court's judgment the defendant's refusal was a willful refusal to answer this question. It seems to me at this point for the Court to hold that the defendant has a right to refuse to answer this question would allow the defendant to provide false information to a probation officer for inclusion in a pre-sentence report, then sit silent and offer no evidence in mitigation nor any statement in allocution, which is exactly what occurred in this situation on advice of counsel. *** [T]he Court's efforts are directed at a search for the truth, including offering the defendant an opportunity to provide mitigating evidence to the Court. I suggest that the reason that the defendant did not raise the Fifth Amendment privilege was, at least potentially, that the defendant and defendant's counsel were fully aware from the tenor of the Court's questions that the Court had no interest in seeking any additional evidence of *** provable criminal activity against the defendant. And I further suggest that the defendant had no reasonable grounds to believe that the defendant's answers to the Court's questions would lead to additional criminal charges, and therefore *** the Fifth Amendment privilege would not apply.

*** It is clear that the Court's effort was solely directed at ascertaining the truth between the defendant's statement to a probation officer for the preparation of a presentence report that was specifically to be used for a presentence investigation and sentencing hearing, and a seventeen-page victim impact statement which was received by the Court. Consequently, the defendant's potential for rehabilitation, which is what the Court is interested in finding out."

After conferring once more with defendant, defense counsel advised the court that:

"[O]n the Fifth Amendment privilege and the case law I have earlier cited to the Court, that my client has determined at this point in time to decline to answer any further questions of the Court."

Defendant was then remanded to the custody of the sheriff with the reminder of the court that he had "the keys to the jail cell" in his pocket. He was told he could get out of jail immediately by answering the court's questions.

Subsequently, on August 28, 1989, this court granted defendant's motion for the setting of bail pending appeal and for a stay of the

sentence of imprisonment on the order of direct civil contempt.

## II. THE JUDGE'S ROLE IN SENTENCING WHEN A PLEA AGREEMENT HAS BEEN REACHED

### A. *The Judge, Not the Parties, Imposes Sentence*

We begin our analysis by acknowledging the legitimacy of the concerns expressed by the trial court and the appropriateness of the judge's role in *sua sponte* addressing those concerns at the sentencing hearing. While it is true that the sentencing hearing was taking place in the context of guilty pleas made pursuant to a plea agreement, it is also true, as the record makes clear, that the trial court had only conditionally concurred in the sentences to which the parties had agreed.

The felony DUI for which defendant was to be sentenced was a probationable Class 4 felony, carrying with it a maximum penitentiary sentence of three years. (Ill. Rev. Stat. 1987, ch. 38, par. 1005—8—1(a)(7).) Accordingly, defendant could have been sentenced to three years in prison or he could have been sentenced to probation, depending upon the particular circumstances of this case as viewed by the trial judge.

■ Sentencing is a judicial function and not something which can be delegated to the parties. We recognize that a large percentage of all criminal cases, both felony and misdemeanor, are disposed of through plea agreements, but all that means is that the sentencing judge ultimately acceded to the agreement the parties reached. Until the judge chooses to place his or her personal *imprimatur* on the agreement, it has no legal effect.

### B. *Even When a Plea Agreement Has Been Reached, the Judge May Seek Information Regarding the Defendant*

While judges are prohibited from initiating discussions regarding plea bargaining (107 Ill. 2d R. 402(d)(1)), they can and often do indicate a tentative concurrence with the agreement reached by the parties. (See 107 Ill. 2d R. 402(d)(2).) The usual reason why a judge indicates only a *tentative* concurrence is to give the judge an opportunity, as in the present case, to receive either a presentence report or the presentation of evidence at the sentencing hearing before finally acceding to the sentence agreed to by the parties.

Whether a trial judge should accede to a proposed plea agreement is occasionally a difficult question to resolve. On the one hand, as we stated earlier, the sentence imposed is the responsibility of the judge, and it is supposed to reflect the judge's informed assessment of all

relevant criteria regarding the defendant and the crime he committed. On the other hand, the judge often does not know and cannot know those factors which the parties considered in reaching their plea agreement. As an example, a plea agreement in which a defendant charged with aggravated criminal sexual assault agrees to plead guilty to some lesser offense or for some lesser penitentiary sentence than the judge would normally think appropriate might be based upon the prosecutor's familiarity with the victim and her strongly held position that she does not wish to testify because of the additional trauma it will cause her. The same consideration is often present when children are the victims of sex offenses. Another example might be a felony DUI case like the present one, in which the prosecutor might realistically assess his case as being flawed due to evidentiary problems establishing who the driver was at the time of the accident or due to police mishandling of necessary physical evidence, resulting in a ruptured chain of evidence.

Because judges cannot have personal knowledge of the existence of any of these factors, they are often in the position of accepting on faith that the prosecutor has adequately prepared and evaluated the case in reaching his determination that the particular plea agreement being presented to the trial judge is appropriate. Given that sentencing is a judicial function and plea bargaining is a prosecutorial function, there is an inherent tension in the process.

■ If a judge, for whatever reason, believes a proposed disposition to be inappropriate, whether too harsh or too lenient, then the judge has the option to reject the plea agreement. Accordingly, we hold that whether sentencing is to take place in an "arm's-length" situation, without any plea agreement having been reached, such as a sentencing after a jury trial, or whether sentencing is to take place after a guilty plea when the trial court has conditionally concurred in a plea agreement, the trial court is entirely within its rights to ensure that it is fully informed as it goes about the process of imposing sentence.

## III. SENTENCING JUDGES MUST BE GIVEN BROAD DISCRETION TO ASCERTAIN PERTINENT INFORMATION

■ The theme that a sentencing judge must be fully informed of all relevant criteria in reaching a sentencing decision has been a consistent refrain in judicial decisions at all levels. In *United States v. Grayson* (1978), 438 U.S. 41, 57 L. Ed. 2d 582, 98 S. Ct. 2610, the United States Supreme Court was presented with an appeal in which the defendant claimed it was improper for a sentencing judge, in fix-

ing the sentence within the statutory limits, to give consideration to the defendant's false testimony observed by the judge during the trial. (*Grayson*, 438 U.S. at 42, 57 L. Ed. 2d at 584, 98 S. Ct. at 2611.) Finding no impropriety in the action of the trial court, the Court stated the following:

"[T]he sentencing judge is obligated to make his decision on the basis, among others, of predictions regarding the convicted defendant's potential, or lack of potential, for rehabilitation.

\*\*\* [H]ow [should a judge] rationally \*\*\* make the required predictions so as to avoid capricious and arbitrary sentences \*\*\*[?] An obvious, although only partial, solution [is] to provide the judge with as much information as reasonably practical concerning the defendant's 'character and propensities[,] . . . his present purposes and tendencies,' *Pennsylvania ex rel. Sullivan v. Ashe*, 302 U.S. 51, 55 (1937), and, indeed, 'every aspect of [his] life.' *Williams v. New York*, 337 U.S., at 250. Thus, most jurisdictions provided trained probation officers to conduct presentence investigations of the defendant's life and, on that basis, prepare a presentence report for the sentencing judge.

\*\*\* [T]raditionally 'a sentencing judge could exercise a wide discretion in the sources and types of evidence used to assist him in determining the kind and extent of punishment to be imposed within limits fixed by law.' [Citation.] 'And modern concepts individualizing punishment have made it all the more necessary that a sentencing judge not be denied an opportunity to obtain pertinent information,' [citation]; indeed, '[t]o deprive sentencing judges of this kind of information would undermine modern penological procedural policies that have been cautiously adopted throughout the nation after careful consideration and experimentation.' \*\*\*

Of course, a sentencing judge is not limited to the often far-ranging material compiled in a presentence report. '[B]efore making [the sentencing] determination, *a judge may appropriately conduct an inquiry broad in scope, largely unlimited either as to the kind of information he may consider, or the source from which it may come.' United States v. Tucker* [(1972)], 404 U.S. 443, 446[, 30 L. Ed. 2d 592, 596, 92 S. Ct. 589, 591]." (Emphasis added.) *Grayson*, 438 U.S. at 47-50, 57 L. Ed. 2d at 588-89, 98 S. Ct. at 2614-15.

The Court restated these views in *Wasman v. United States* (1984), 468 U.S. 559, 82 L. Ed. 2d 424, 104 S. Ct. 3217, as follows:

"It is now well established that a judge or other sentencing authority is to be accorded very wide discretion in determining an appropriate sentence. The sentencing court or jury must be permitted to consider any and all information that reasonably might bear on the proper sentence for the particular defendant, given the crime committed." *Wasman*, 468 U.S. at 563, 82 L. Ed. 2d at 430, 104 S. Ct. at 3220.

In *People v. La Pointe* (1981), 88 Ill. 2d 482, 431 N.E.2d 334, the Illinois Supreme Court discussed the subject of sentencing as follows:

"The Unified Code of Corrections vests a wide discretion in sentencing judges in order to permit reasoned judgments as to the penalty appropriate to the particular circumstances of each case. \*\*\*

\*\*\* The sentencing judge is always \*\*\* 'charged with the difficult task of fashioning a sentence which would strike the appropriate balance between protection of society and rehabilitation of the offender.' \*\*\*

\*\*\* In *People v. Adkins* (1968), 41 Ill. 2d 297, 300-01, this court noted:

'In Illinois, too, we have long held that the judge in determining the character and extent of punishment is not limited to considering only information which would be admissible under the adversary circumstances of a trial. While it must exercise care to insure the accuracy of information considered and to shield itself from what might be the prejudicial effect of improper materials [citation], "the court is not confined to the evidence showing guilt, for that issue has been settled by the plea. The rules of evidence which ordinarily obtain in a trial where guilt is denied do not bind the court in its inquiry. It may look to the facts of the [crime], *and it may search anywhere*, within reasonable bounds, for other facts which tend to aggravate or mitigate the offense. In doing so *it may inquire into* the general moral character of the offender, his mentality, *his habits*, his social environments, his abnormal or subnormal tendencies, his age, his natural inclination or aversion to commit crime, the stimuli which motivate his conduct, and, as was said in *People v. Popescue*, [345 Ill. 142], the judge should know something of the life, family, occupation and record of the person about to be sentenced." ' " (Emphasis added.) *La Pointe*, 88 Ill. 2d at 492-95, 431 N.E.2d at 348-50.

In *People v. Ward* (1986), 113 Ill. 2d 516, 499 N.E.2d 422, the

court stated the following:

> "The imposition of a criminal sentence should not be reduced to a litany of accepted and approved but meaningless words and phrases. In determining the appropriate sentence, the trial judge must consider all matters reflecting upon the defendant's personality, propensities, purposes, tendencies, and indeed every aspect of his life relevant to the sentencing proceeding." (*Ward*, 113 Ill. 2d at 527, 499 N.E.2d at 426.)

The supreme court also quoted approvingly the following remarks from *United States v. Hendrix* (2d Cir. 1974), 505 F.2d 1233, 1236, as follows:

> " 'Impressions about the individual being sentenced—the likelihood that he will transgress no more, the hope that he may respond to rehabilitative efforts to assist with a lawful future career, the degree to which he does or does not deem himself at war with his society—are, for better or worse, central factors to be appraised under our theory of "individualized" sentencing.' " *Ward*, 113 Ill. 2d at 528-29, 499 N.E.2d at 426-27.

## IV. LEGISLATIVE PROVISIONS REGARDING SENTENCING

As noted by the supreme court in *La Pointe*, the legislature has provided, in the Unified Code of Corrections (Code) (Ill. Rev. Stat. 1989, ch. 38, par. 1001—1—1 *et seq.*), a detailed statutory scheme regarding sentencing. Article 3 of the Code (Ill. Rev. Stat. 1989, ch. 38, par. 1005—3—1 *et seq.*) provides specific directions as to how presentence investigations and reports are to be prepared. The legislature intended that such reports, prepared in compliance with section 5—3—2(a) of the Code (Ill. Rev. Stat. 1989, ch. 38, par. 1005—3—2(a)) would provide the court with a comprehensive assessment of the defendant to be sentenced. Article 4 of the Code (Ill. Rev. Stat. 1989, ch. 38, pars. 1005—4—1, 1005—4—2) sets forth how sentencing hearings should be conducted, while article 5, specifically sections 5—5—3.1 and 5—5—3.2 of the Code (Ill. Rev. Stat. 1989, ch. 38, pars. 1005—5—3.1, 1005—5—3.2), provides the sentencing judge with many specific factors to consider in mitigation and aggravation.

Regarding the DUI offenses for which the defendant in the present case was to be sentenced, the legislature, as an expression of its concern about the carnage being wreaked upon our highways by drunk drivers, added a special provision for sentencing judges as follows:

> "(e) After a finding of guilt and prior to any final sentencing, or an order for supervision, for an offense based upon an arrest

for a violation of this Section or a similar provision of a local ordinance, individuals shall be required to undergo a professional evaluation to determine if an alcohol or other drug abuse problem exists and the extent of such a problem. Programs conducting these evaluations shall be licensed by the Department of Alcoholism and Substance Abuse. The cost of any such professional evaluation shall be paid for by the individual required to undergo such professional evaluation." Ill. Rev. Stat. 1989, ch. 95½, par. 11—501(e).

■ In *People v. Baker* (1988), 123 Ill. 2d 233, 526 N.E.2d 157, the Illinois Supreme Court construed the above section as being permissive, not mandatory (*Baker*, 123 Ill. 2d at 237, 526 N.E.2d at 160). In so holding, the court stated the following:

"At sentencing, the circuit court may conduct a hearing, largely unlimited, regarding either the kind of information it may consider or the source from which it may come. [Citation.] The duty of the sentencing court is to assess the character of the defendant, the seriousness of the offense and the rehabilitative potential of the defendant. (Ill. Rev. Stat. 1987, ch. 38, par. 1005—4—1.) In doing so, the court must weigh factors in mitigation 'having due regard for the character of the offender, the nature and circumstances of the offense and the public interest.' (Ill. Rev. Stat. 1987, ch. 38, par. 1005—5—3.1.)" *Baker*, 123 Ill. 2d at 239-40, 526 N.E.2d at 161.

## V. TRIAL COURT MAY INQUIRE OF DEFENDANT AT SENTENCING HEARING

■ Based upon the foregoing, we reject defendant's argument that the trial court at a sentencing hearing may not make inquiries of the defendant unless he has either testified or exercised his right of allocution. If, as the cited authority maintains, the trial court "may search anywhere, within reasonable bounds" (*People v. McWilliams* (1932), 348 Ill. 333, 336, 180 N.E. 832, 834; see also *La Pointe*, 88 Ill. 2d at 495, 431 N.E.2d at 350) for facts which tend to either aggravate or mitigate the offense, then surely inquiries of the defendant must be "within reasonable bounds." As the trial court in the present case observed, the defendant is frequently the *best source* for such information. It simply makes no sense to urge trial courts to take every reasonable step to prepare themselves appropriately for their important sentencing decisions, and then to cut them off from the best source of information.

■ Furthermore, whether the defendant testifies or exercises his

right of allocution is irrelevant to the need for the sentencing judge to be fully informed. We emphasize that neither the prosecutor nor the defense attorney is going to be imposing sentence, so the court ought not to be bound by their assessments of what constitutes sufficient information before a sentence is imposed.

Our holding that the sentencing judge may properly inquire of the defendant is supported by this court's decision in *People v. Jones* (1986), 142 Ill. App. 3d 51, 491 N.E.2d 515. In *Jones*, the defendant was before the court for sentencing on multiple burglary and theft convictions. Defendant's presentence report stated he had a cocaine and heroin addiction that he was supporting at a cost of $100 per day. Defendant's trial counsel asked the court to sentence defendant to intensive probation supervision so that he could get needed counseling. In response to the judge's question, defendant said he had been using drugs two or three times each day during the last year. The court then asked defendant from whom he obtained the drugs. The defendant tried to evade the question, but ultimately said, " 'if I was to tell who I got drugs from and they found out about it, they would more likely try to kill me, and I am pretty sure of it.' " (*Jones*, 142 Ill. App. 3d at 54, 491 N.E.2d at 517.) Defendant was then sentenced to four years in prison. On these facts, this court wrote the following:

"The defendant requested intensive probation supervision, and the court had a duty to determine the likelihood of success of such program in deciding whether such a program should be used for the defendant. The availability and source of defendant's drugs is of paramount importance in considering the probability of success of this program with defendant. If drugs were readily available, the likelihood of success would be remote. The court's inquiry was, therefore, quite legitimate." *Jones*, 142 Ill. App. 3d at 55, 491 N.E.2d at 518.

In addition to the foregoing reasons why the court's inquiry in *Jones* was appropriate, we note that forcing a convicted defendant to reveal the sources of the drugs, what he claims to be the root cause of his criminal conduct, may have a positive rehabilitative effect by forcing the defendant "to burn his bridges" to the drug dealers. After all, how seriously can a court consider a defendant's desire to "kick" his drug habit to be when he is unwilling to break his ties to the drug sources? Even if the defendant's revealing these sources proved insufficient (as is likely to be the case) to assist law enforcement authorities in any way other than to provide them with information as to current drug trafficking in a particular area, the fact that defendant revealed the names of the people providing him with drugs is likely to strain his

relations with those people. A benefit of these strained relations may be that defendant in the future might have difficulty obtaining drugs, thereby making it easier for him to "go straight."

Last, a defendant's willingness to reveal his drug sources, either publicly in court or privately to law enforcement agents (in whatever fashion the court in its discretion decides is best), is a strong plus factor in assessing both the defendant's rehabilitative potential and his willingness to comply with the conditions of probation. A sentencing judge faced with a defendant who blames his criminal behavior on drug abuse, but who does not reveal the sources of those drugs, may properly view the defendant's rehabilitative potential with skepticism. Under these circumstances, the sentencing judge might well have considerable difficulty finding either of the following mitigating factors to be present: the defendant's criminal conduct was the result of circumstances unlikely to recur, or the character and attitudes of the defendant indicate that he is unlikely to commit another crime. Ill. Rev. Stat. 1989, ch. 38, pars. 1005—5—3.1(a)(8), (a)(9).

We believe these views to be consistent with those of the United States Supreme Court as stated in *Roberts v. United States* (1980), 445 U.S. 552, 63 L. Ed. 2d 622, 100 S. Ct. 1358. In *Roberts*, the issue before the Court was whether the sentencing judge could properly consider, as one factor in imposing sentence, the defendant's refusal to cooperate with officials investigating a criminal conspiracy in which he was a confessed participant. (*Roberts*, 445 U.S. at 553, 63 L. Ed. 2d at 626, 100 S. Ct. at 1360.) The Court ruled that the judge could and explained as follows:

> "There is no question that [defendant] rebuffed repeated requests for his cooperation ***. Nor does [defendant] contend that he was unable to provide the requested assistance. Indeed, [defendant] concedes that cooperation with the authorities is a 'laudable endeavor' that bears a 'rational connection to a defendant's willingness to shape up and change his behavior....' [Citation.] Unless a different explanation is provided, a defendant's refusal to assist in the investigation of ongoing crimes gives rise to an inference that these laudable attitudes are lacking.
>
> ***
>
> *** Unless his silence is protected by the privilege against self-incrimination, *** the criminal defendant no less than any other citizen is obliged to assist the authorities. [Defendant], for example, was asked to expose the purveyors of heroin in his own community in exchange for a favorable disposition of his

case. By declining to cooperate, [defendant] rejected an 'obligatio[n] of community life' that should be recognized before rehabilitation can begin. [Citation.] Moreover, [*defendant's*] *refusal to cooperate protected his former partners in crime, thereby preserving his ability to resume criminal activities upon release. Few facts available to a sentencing judge are more relevant to* ' *"the likelihood that* [*a defendant*] *will transgress no more, the hope that he may respond to rehabilitative efforts to assist with a lawful future career,* [*and*] *the degree to which he does or does not deem himself at war with his society."* ' *United States v. Grayson,* [438 U.S. at 51, 57 L. Ed. 2d at 590, 98 S. Ct. at 2616,] quoting *United States v. Hendrix,* 505 F.2d 1233, 1236 (CA2 1974)." (Emphasis added.) *Roberts,* 445 U.S. at 557-58, 63 L. Ed. 2d at 628-29, 100 S. Ct. at 1362-63.

We are familiar with the decision of the Fifth District Appellate Court in *People ex rel. Kunce v. Hogan* (1976), 37 Ill. App. 3d 673, 346 N.E.2d 456, which held that because a sentencing judge had no right to obtain information from a defendant, the judge had no authority to order a defendant to speak to a probation officer. (*Kunce,* 37 Ill. App. 3d at 677, 346 N.E.2d at 461.) We note that the court in *Kunce,* in reaching that conclusion, placed great weight on section 5—3—1 of the Code (Ill. Rev. Stat. 1973, ch. 38, par. 1005—3—1), which the court believed entitled a defendant to waive the preparation of a presentence report. (*Kunce,* 37 Ill. App. 3d at 676, 346 N.E.2d at 460.) However, four years after *Kunce* was decided, the Illinois Supreme Court construed section 5—3—1 of the Code as mandatory and not subject to waiver by a defendant. (See *People v. Youngbey* (1980), 82 Ill. 2d 556, 564, 413 N.E.2d 416, 421.) Accordingly, to the extent that *Kunce* may be inconsistent with the views expressed herein, we decline to follow it, due both to the policy reasons we discussed earlier and to the removal of one of the major foundations underlying that decision.

## VI. THE PROPRIETY OF THE FINDING OF DIRECT CIVIL CONTEMPT

Defendant argues that the court's finding him to be in direct civil contempt of court for his refusal to answer the court's questions at the sentencing hearing violated his fifth amendment right against self-incrimination. However, we note at the outset that, as the trial court correctly observed at a later hearing, the defendant *never objected* to the court's questions at the sentencing hearing on that basis.

In *Roberts,* the United States Supreme Court was presented with a defendant who similarly did not raise the claim of privilege at the time

his failure to assist the police was described by the judge at the sentencing hearing as a consideration for choosing the particular sentence imposed. (We note that in *Roberts*, the fifth amendment claim apparently was raised for the first time on appeal; in the present case, it was raised in a written motion filed three days after the sentencing hearing was aborted.) The Court in *Roberts* held that, "The Fifth Amendment privilege against compelled self-incrimination is not self-executing." (*Roberts*, 445 U.S. at 559, 63 L. Ed. 2d at 630, 100 S. Ct. at 1364.) The Court also held that in most instances, "the privilege may not be relied upon unless it is invoked in a timely fashion." (*Roberts*, 445 U.S. at 559, 63 L. Ed. 2d at 630, 100 S. Ct. at 1364.) The *Roberts* Court compared the case before it to *United States ex rel. Vajtauer v. Commissioner of Immigration* (1927), 273 U.S. 103, 71 L. Ed. 560, 47 S. Ct. 302, observing that, as in *Vajtauer*, "[defendant] 'did not assert his privilege or in any manner suggest that he withheld his testimony because there was any ground for fear of self-incrimination. His assertion of it here is evidently an afterthought.' " *Roberts*, 445 U.S. at 560, 63 L. Ed. 2d at 630, 100 S. Ct. at 1364, quoting *Vajtauer*, 273 U.S. at 113, 71 L. Ed. at 566, 47 S. Ct. at 306.

■ We think "afterthought" may be a generous description of defendant's failure in the present case to raise his claim of fifth amendment privilege until three days after the sentencing hearing was aborted due to defendant's refusal to answer the court's questions. Our reading of the record suggests that defendant's refusal to answer was based on nothing more than defense counsel's pique that the court was questioning his client. No authority need be cited as to the insufficiency of that ground to justify defendant's refusal.

■ Nonetheless, while the matter was still within the court's authority to act, defendant filed his "motion to require hearing," and both in the motion and at the hearing held pursuant to that motion, defendant did raise the fifth amendment privilege. We note, however, that the defendant argued both in the motion and at the hearing that he was "entitled to a hearing on notice to determine the issues of contempt" and to assert any defenses he may have. While defendant is correct that he has a right to assert a fifth amendment privilege at a hearing on whether he should be found to be in contempt, his other assertions are erroneous.

This court recently discussed the procedural rights of persons charged with direct civil contempt as follows:

> "Direct civil contempts may be summarily adjudicated immediately upon occurrence of the contemptuous acts in the same manner as direct criminal contempts for which sanctions are im-

posed for the purpose of maintaining order in the courtroom. *** Direct civil contempt usually involves an unequivocal refusal to perform an affirmative act for the benefit of an opposing litigant in open court, such as a refusal to sign a document. Accordingly, there are usually no disputed factual questions ***." *In re Marriage of Betts* (1990), 200 Ill. App. 3d 26, 52.

In *Roberts*, the Court stated the following:

"It is the duty of a court to determine the legitimacy of a witness' reliance upon the Fifth Amendment. [Citation.] A witness may not employ the privilege to avoid giving testimony that he simply would prefer not to give." *Roberts*, 445 U.S. at 560 n.7, 63 L. Ed. 2d at 630 n.7, 100 S. Ct. at 1364 n.7.

■■ Whether due to defendant's erroneous argument or to confusion about the nature of the proceeding, the record before us shows that the trial court never conducted a hearing "to determine the legitimacy" of defendant's fifth amendment claim, as raised in his "motion to require hearing." Accordingly, we vacate the finding of direct civil contempt and remand for further proceedings in accordance with the views expressed herein. In doing so, we are not requiring (or even suggesting) that the court on remand pick up where it left off by again asking questions of defendant. If the court prefers, it may proceed instead to finish the sentencing hearing without questioning the defendant further.

The court might also consider on remand an action that was not taken previously, namely, an inquiry of the State whether it would be willing to give defendant immunity from prosecution for any drug usage or involvement he is forced to reveal as a result of the court's questions. Because the fifth amendment privilege was not raised at the sentencing hearing, the court could hardly have broached this point. Given that to our collective knowledge, no defendant in the history of this State has *ever* been prosecuted based upon information about drug activities that the State discovered through information garnered for or presented at a sentencing hearing, the State might well conclude that the interests it would be giving up are illusory in the first place.

■■ Before concluding, we wish to add that we believe an order of the court directing a defendant, upon pain of contempt, to answer a court's question at the sentencing hearing, such as occurred here, is an action which ought to be a last resort, if ever.

As shown by this record, serious procedural problems are likely to arise and, perhaps more importantly, it is an action that is unnecessary. The better practice would be for the court, when presented at the sen-

tencing hearing with contradictory information, such as the claims of this defendant as set forth in the presentence report and the assertions of his former wife, to "think out loud" and reveal to the parties how the court views the evidence. Thus, if the court were to state that it believes defendant lied in some of his representations to the probation officer and nothing further was offered by the parties by way of evidence or explanation, the court would be entitled to draw inferences upon that belief and impose sentence accordingly.

Vacated and remanded.

SPITZ, J., concurs.

PRESIDING JUSTICE KNECHT, specially concurring:

I concur in the result and agree with the majority analysis, but have additional comment on the use of contempt. A scholarly review of the contempt power is not necessary. This power should be used cautiously and to some purpose.

In my view, this defendant had no obligation to answer the trial court's questions. The court had every right to *ask* the questions, and defendant may suffer certain consequences if he fails to answer, but contempt for refusal to answer is not one of those consequences.

Defendant did not testify at his sentencing hearing nor exercise his right of allocution. If he responds to the trial court's questions, and is disrespectful, then contempt might be appropriate. If he responds and is evasive, inconsistent, or uncooperative, the court might well consider his attitude as one lacking in remorse or honesty.

The court has the obligation to seek relevant information to assist in sentencing. It has both the power and the flexibility it needs to acquire that information and make informed sentencing decisions. It does not need, nor does it have, the power to command a citizen to answer questions in these circumstances.

A defendant who refuses to answer appropriate questions in these circumstances runs the risk his refusal will be considered by the court in assessing rehabilitative potential for both probation consideration and the type and length of sentence to be imposed. That is defendant's choice. If defendant has a legitimate fifth amendment claim then the refusal to answer should not be considered in any way.

The use of the contempt power in these circumstances serves no purpose. It is both unnecessary and in error.