NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2023 IL App (4th) 220421-U

NO. 4-22-0421

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
April 19, 2023
Carla Bender
4ᵗʰ District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
|     Plaintiff-Appellee, | ) | Circuit Court of |
|     v. | ) | Peoria County |
| ANTHONY L. JACKSON, | ) | No. 18CF337 |
|     Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | John P. Vespa, |
| | ) | Judge Presiding. |

JUSTICE LANNERD delivered the judgment of the court.
Justices Cavanagh and Zenoff concurred in the judgment.

**ORDER**

¶ 1    *Held:*    (1) The trial court did not err in denying defendant's motion to suppress because defendant was not in custody before he was provided his *Miranda* warnings.

(2) Defendant failed to establish the State committed a *Brady* violation.

(3) Defendant failed to establish the trial court made a clear or obvious error in imposing a natural life sentence.

¶ 2    In June 2018, a grand jury indicted defendant, Anthony L. Jackson, on four counts of first degree murder (720 ILCS 5/9-1(a)(1), (a)(2) (West 2018)) and one count of unlawful possession of a weapon by a felon (720 ILCS 5/24-1.1(a) (West 2018)). In March 2022, after a bench trial, the trial court found defendant guilty on all charges. In May 2022, the court sentenced defendant to consecutive prison terms of natural life for first degree murder and six years for unlawful possession of a weapon by a felon. Defendant raises the following issues on appeal: (1) the court erred in denying his motion to suppress because the investigating police officers

engaged in a "question first, warn later" custodial interrogation; (2) the State failed to identify and disclose material, exculpatory evidence in its possession to defendant's trial counsel; and (3) the court abused its discretion by imposing a natural life sentence on defendant. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4        In the early morning hours of June 7, 2018, the victim in this case, Timothy Jackson, was cut multiple times by defendant, requiring medical care at the local hospital. At 6:18 a.m., the victim texted his girlfriend, Danyelle Riley, to tell her he was on his way home from the hospital. Approximately 10 minutes later, Riley heard gunshots outside her house. Riley saw a "bluish silver" vehicle driving away. Police officers arrived soon thereafter. The victim was deceased.

¶ 5        On June 19, 2018, a grand jury indicted defendant. According to the indictment, defendant killed the victim by shooting him with a handgun on or about June 7, 2018.

¶ 6        On August 18, 2021, citing section 114-11 of the Code of Criminal Procedure of 1963 (725 ILCS 5/114-11 (West 2018)), defendant filed a motion to suppress evidence, alleging defendant was subjected to a custodial interrogation at the police station on June 7, 2018, without being informed of his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966). Defendant also filed a motion to quash arrest and suppress evidence on April 11, 2019. However, only the motion to suppress filed on August 18, 2021, is at issue in this appeal.

¶ 7        According to the relevant motion, during his police station interview, defendant made statements to detectives about an altercation he had with the victim before the murder. After defendant made this statement, the detectives stopped the interview and informed defendant of his *Miranda* rights. After he was Mirandized, defendant continued speaking with the officers. Defendant's motion to suppress alleged the detectives deliberately used a two-stage interrogation technique to elicit incriminating statements from him.

¶ 8　　　　　On December 16, 2021, the trial court held a hearing on defendant's motion to suppress. Defendant called Detective Matt Legaspi to testify. Legaspi testified he was a detective with the Peoria Police Department in June 2018 and worked on this case. On June 7, 2018, he met with defendant at the police station. Before meeting at the station, they spoke on the phone. Defendant had called the police station and asked if someone wanted to talk to him. The dispatcher connected defendant with Legaspi. Defendant told Legaspi he heard his uncle had been shot and killed, he had just been with his uncle, and he might have information on who was responsible. Legaspi told defendant the police were looking for any information they could obtain regarding the victim's death. Then, Legaspi offered to meet defendant somewhere or suggested defendant could come to the police station if defendant was willing to speak with the police.

¶ 9　　　　　When they spoke, defendant was the only person of interest in the case. Danyelle Riley had told Detective Scott Hulse that the victim said he and defendant had gotten into a fight and defendant cut him with a knife. Riley said the victim had to go to the hospital because of his wounds. However, defendant was not an actual suspect in the shooting at that time.

¶ 10　　　　　Defendant voluntarily came to the police station without any kind of police escort. Legaspi was notified defendant was at the station at 10:20 a.m. on June 7, 2018. At 11:27 a.m., defendant was escorted to an interview room and audio/video recording commenced. Legaspi and Detective Hulse came into the room around 11:29 a.m. According to Legaspi, he did not utilize any tactics during the interview with defendant and was with defendant for about an hour. Defendant was not handcuffed during the interview.

¶ 11　　　　　Legaspi stated he greeted defendant and thanked him for coming to the station. He believed defendant asked for a drink, which was provided. Detective Hulse and Legaspi then sat down to talk with defendant. Defendant was not Mirandized at the beginning of the interview.

- 3 -

Legaspi said the door of the interview room was shut, but he suspected it was unlocked because it was department policy to leave interview rooms unlocked if a witness was inside. Witnesses were also allowed to keep their personal belongings. Legaspi indicated he thought defendant had his cell phone, shoes, and belt with him. According to Legaspi, when a person is a suspect, he or she is not allowed to keep those items during an interview for safety reasons. Legaspi noted defendant was even making calls from inside the interview room.

¶ 12        The detectives asked defendant what he wanted to talk to them about, and defendant responded that he might have some information about his uncle's death. Defendant then began talking to the officers about who he thought may have killed the victim. After defendant indicated he had been in an altercation with the victim before the murder, the officers informed him of his *Miranda* rights. Defendant chose to continue speaking with the police.

¶ 13        During its cross-examination of Legaspi, the State introduced the audio/video recording of defendant's interview. The recording showed defendant coming into the interview room. A little over 1 minute and 40 seconds later, the detectives entered the room. Approximately four minutes later, defendant made a comment that he and his uncle "got into it." At that point, the detectives began asking defendant for some basic information regarding his name, phone number, address, etc. About two and half minutes after defendant said he and his uncle "got into it," the detectives indicated the room was audio and video recorded and told defendant they wanted to inform him of his *Miranda* rights. They did so and asked defendant if he still wanted to talk to the detectives. His response is not entirely clear from the audio on the recording, but it sounds like he responded, "Of course." Defendant then continued to speak with the detectives.

¶ 14        After viewing the recording of defendant's interview, the trial court denied defendant's motion to suppress without explanation. On December 28, 2021, defendant filed a

motion asking the court to reconsider its denial of the motion to suppress and for specific factual findings of whether the "interrogation" was custodial, whether the police used an intentional two-stage interrogation technique, whether *Miranda* warnings were required during the interview, and any other factual findings the court determined were necessary.

¶ 15        On December 29, 2021, at a hearing on defendant's motion to reconsider, the trial court indicated it was "stunned" the motion was filed. According to the court, the recording showed the conversation between the officers and defendant was nothing more than an innocent, casual conversation. The court found the detectives were not asking probing questions at the beginning of the interview. Further, the court concluded defendant was not in custody until after defendant indicated he and the victim got into an altercation before the murder. After defendant made the statement about the altercation, the officers asked defendant for his contact information and then Mirandized him.

¶ 16        The trial court found the earliest point in time when defendant was in custody was when he was Mirandized. Further, the court found the police did not use any two-step interrogation process to circumvent *Miranda*. The court then denied defendant's motion to reconsider.

¶ 17        On January 6, 2022, defendant waived his right to a jury trial.

¶ 18        Defendant does not make a sufficiency of the evidence argument on appeal, so an extensive recitation of the evidence presented at trial and arguments regarding that evidence is unnecessary. However, for context, a brief discussion of some of the trial evidence is relevant.

¶ 19        Danyelle Riley testified she was living with the victim, who was her boyfriend, on June 7, 2018. The victim came home around 2 or 2:30 a.m. on June 7 and was preparing for bed when he received a phone call, which the victim said was from "Ant," who Riley knew was defendant. The victim told "Ant" he was trying to go to bed but eventually agreed to come outside.

The victim told Riley that "Ant" was "tweakin" because he was mad about something the victim allegedly said.

¶ 20 When the victim left, Riley went back to sleep. Later, the victim woke her up and said, "that MF stabbed me up." The victim was covered in blood and had a horseshoe-shaped cut on his right arm, a "big gouge taken out" of his back, and two puncture wounds to his stomach. The victim did not want Riley to call an ambulance because he said defendant warned him not to call the police. The victim then drove himself to the hospital.

¶ 21 The State presented evidence the victim was treated at the hospital for multiple stab wounds to his left upper abdomen, left lateral flank hip area, left wrist, and right forearm. The victim declined to tell a police officer at the hospital what happened. Multiple sutures and stitches were used to treat the victim's injuries. The victim was released from the hospital around 6:10 a.m.

¶ 22 Riley testified she received a text message from the victim at about 6:18 a.m. saying he was on his way to her house. About 10 minutes later, she heard five gunshots. She looked out the window and saw the victim's car parked in front of her house. She saw a "blueish silver" vehicle leave the area.

¶ 23 The police arrived quickly and found the deceased victim in the car. Some of Riley's neighbors also saw a silver-colored car at the scene. Ahmed Sameer testified the car was a Chevrolet Impala. In addition, he saw it stop, someone point a gun out of the window, and then someone fire the gun.

¶ 24 Officer Scott Bowers testified he was in the crime scene unit and collected seven .40-caliber cartridge casings at the crime scene. He also collected bullets from the victim's vehicle and from the victim's body after his autopsy.

¶ 25 Detective Scott Hulse testified he responded to the scene of the shooting. He spoke

with Riley at the scene and later interviewed her at the police station. Riley provided him with the name of a person named "Ant," who she said was the victim's nephew.

¶ 26 Officer Matt Lane testified Detective Legaspi told him a possible person of interest in the shooting went by the name or nickname "Ant." Lane sent out a message to officers in his unit to see if anyone had information on a person called "Ant." He was told defendant's nickname was "Ant." Lane had previously done an investigation involving defendant so he drove to an apartment building that Lane associated him with. Lane indicated he was also looking for a light silver Impala with black rims. Lane did not see the car at the first apartment building so he drove across the street to another apartment complex, Villa Bordeaux, and observed a light blue Impala with black rims.

¶ 27 According to Lane's testimony, the car was registered to a male from Dolton, Illinois. Lane knew defendant and his associates were from that area. He then conducted surveillance on the vehicle. At 10:35 a.m., he saw a Chevy Tahoe driven by a black female with two black male passengers inside enter the parking lot. Lane later identified one of the men as defendant. He watched the man he identified as defendant enter Building 3 and then leave the building eight minutes later. Defendant returned to the Tahoe, and the vehicle then left the parking lot.

¶ 28 Later that day, Lane helped execute a search warrant on apartment No. 317 in Building 3 of the Villa Bordeaux apartment complex. Apartment No. 317 was rented by Shakyra Parkman. A black Smith & Wesson semiautomatic handgun was found in a diaper box that had been in the closet of a baby's room during the search of apartment No. 317 in Building 3. A rifle was also found in the apartment. The State later introduced evidence showing that the cartridge casings and bullet fragments recovered were fired by the handgun found in apartment No. 317.

¶ 29     Shakyra Parkman, a friend of defendant, testified she lived on the third floor of a building at the Villa Bordeaux apartments on June 7, 2018. She indicated her unit could have been apartment No. 317 in Building 3. Shakyra and her infant daughter lived there. Early on the morning of June 7, defendant came into her apartment carrying something wrapped in a shirt. He went into her daughter's bedroom and Parkman's bedroom. She heard him rummaging around in the closet of her daughter's bedroom. Defendant did not stay very long. Later on the morning of June 7, she drove defendant to the police station in her black Chevy Tahoe. Parkman testified defendant drove a silver-colored Chevy car. Her testimony and interviews with the police were inconsistent regarding whether an individual named Cottrell Mackey came into her apartment with defendant that morning.

¶ 30     Officer David Buss testified he worked in the crime scene unit on June 7, 2018, and participated in the execution of search warrants for apartment No. 317 at Villa Bordeaux and for the Chevy Impala parked there. Inside the Impala, he found a folding knife and driver's license or identification (ID) card in the center console. The ID card belonged to defendant and was located underneath the knife. The knife had red blood-like stains on the handle. In apartment No. 317, Buss collected a Smith & Wesson .40-caliber handgun and a Hi-Point carbine rifle. The pistol was loaded and ready to be fired.

¶ 31     Detective Scott Hulse testified defendant arrived at the police station in a black sport utility vehicle, which remained outside the police station, on June 7, 2018. The desk sergeant called and informed the detectives a man was in the lobby wanting to talk to them. The man was defendant. Hulse indicated he talked to defendant that morning in a recorded interview. Fourteen minutes of the interview was played for the jury. In the interview, defendant told the detectives he and his uncle "got into it" before his uncle was killed. The detective later asked defendant what he

meant by "got into it." Defendant responded that he had a knife, his uncle had a knife, and the two were fighting with the knives. Defendant said he was not cut and claimed not to know whether his uncle was cut.

¶ 32      The trial court found defendant guilty on all counts.

¶ 33      On April 18, 2022, defendant filed a posttrial motion requesting a new trial and additional relief. Defendant argued in part that he should be granted a new trial for the following reason:

> "Officer Buss and Marwan Haj both testified that the video of Defendant and [the victim] at a gas station on the day of the murder was an edited clip from a longer video that was thirty (30) minutes to one (1) hour. This longer unedited video remained in the possession of the Peoria Police Department and was not provided to Defendant."

¶ 34      In support of his motion for a new trial, defendant relied on the testimony of Officer Richard Linthicum. He testified he went to Cooper's gas station located at the corner of Sheridan Road and McClure Avenue to review surveillance video because the police had learned defendant and the victim had met there. He watched the video at the gas station. He downloaded video footage onto a thumb drive, took it to the police station, uploaded it onto his computer, and then burned the video footage onto a compact disc. Linthicum indicated People's exhibit No. 45 was the video downloaded from Cooper's gas station. People's exhibit No. 45 had three video clips on it. On cross-examination, Linthicum testified the original downloaded video that is in evidence covers a broader period of time. People's exhibit No. 45 contained shortened segments of the video. Linthicum indicated the original video he obtained was either in the case file or in evidence. On redirect, Linthicum testified he downloaded video for the whole hour between 1 a.m. and 2

a.m. He then clipped out portions of the video where he saw the victim and the suspect.

¶ 35    On May 4, 2022, the trial court held a hearing on defendant's posttrial motion and discussed the gas station video. The State presented a certified copy of additional discovery that was given to defendant's prior counsel, attorney Derek Asbury, on July 25, 2019. The court asked the State if the discovery got from attorney Asbury to defendant's current counsel, attorney Christopher Nelson. The State responded it could not "babysit their firm, Judge." The State argued the defense had been given the full digital video disc. Later, the State said, "All we're representing is that they have the only video we ever received from the gas station. That was the video. I don't know if it's 30 minutes or whatever they're claiming in their motion. They have the full video." The court asked attorney Nelson if he ever subpoenaed the longer video from the Peoria Police Department. Attorney Nelson said he did not. The State also asserted the defense was given a copy of an edited part of the video.

¶ 36    The trial court found the State gave defendant everything it had. The court then noted it is not the State's job to be an investigator for the defense, noting the defense has equal subpoena power. Defense counsel responded that the defense may have equal subpoena power, but the defense was given no indication the video it was given by the State was different from what the police took from the gas station. Defense counsel argued it was the State's burden to produce material that was in the possession of the police. The court disagreed.

¶ 37    The State then made the following statement: "[I]f some other officer made a comment, well, this edited portion which we use at trial is part of a longer, that's correct. The inference that, well, there's some long video out there that the police and the State's Attorney have kept from me is simply wrong, Judge." The trial court then asked defense counsel if it had any evidence to present, and counsel said no. Thereafter, the court denied defendant's posttrial motion.

¶ 38          On May 18, 2022, the trial court held defendant's sentencing hearing. The court indicated the sentencing range for defendant's murder conviction was 45 years to life and would be served in its entirety. The range for the unlawful possession conviction was 2 to 10 years. The court stated the presentence investigation report (PSI) indicated defendant had three prior felony convictions. In addition, based on its review of the PSI, the court stated defendant did not complete high school, was unemployed, had four children, "is a member of a street gang," and drinks two to three beers and a pint of "Remy" daily. The court asked the State if it disputed any of what the court said. The State said, "No, Your Honor." The court then asked defense counsel, "Defense, do you dispute any of that?" Defense counsel responded, "No, Judge."

¶ 39          At the sentencing hearing, Mary McFadden testified for the State. She read a letter she wrote to defendant stating she had hated him for four years because he killed her daughter's father. The victim's daughter was seven years old at the time of the murder. According to McFadden, the victim meant more to his daughter than anyone else and a piece of her daughter died when he was murdered. While indicating she forgave defendant so she could have peace and be a stronger mother for her daughter, she still believed defendant needed to pay for his crimes by spending the rest of his life in prison. She said she hoped defendant would go to sleep every night knowing he killed one of the only men who was always there for him, never doubted him, and never gave up on him. McFadden noted she thought defendant sat emotionless throughout the trial and was heartless for both killing his own family member and showing no remorse for doing so.

¶ 40          Neither the State nor defendant presented any other sentencing evidence, and the case proceeded to arguments. The State indicated this was a cold-blooded, heartless murder. The State also noted defendant did not have a terrible childhood to blame for his behavior. He had a loving family and reported no abuse. However, according to the State, defendant spent too much

time on the streets enjoying the gang life.

¶ 41        When defendant was 18, he was given the opportunity to move to Peoria to live with the victim, who was his uncle. Defendant reported he was very close with his uncle and spent a lot of time with him. In defendant's interview with the police, defendant said he and his uncle were in a knife fight. After the knife fight, defendant's uncle had wounds to his body requiring a hospital visit. Defendant had no wounds. The State noted that while the victim was at the hospital, defendant kept texting him, waiting for him to be released.

¶ 42        According to the State, after the victim was released from the hospital, defendant killed him while they were on the phone together. The victim was in his car, and defendant shot him five times. The State asserted defendant showed no remorse during the trial and showed no reaction when trial court pronounced him guilty. The State asked the trial court to sentence defendant to something on the higher end of the sentencing range for the murder conviction and 10 years on the weapon charge.

¶ 43        Defense counsel noted defendant had not acknowledged his culpability. Counsel also argued this case only made sense if defendant was high on alcohol and/or drugs when his uncle was murdered. According to defense counsel, only a person struggling with addiction would continue a lifestyle like defendant's after being shot numerous times as a teenager. Defense counsel asserted a situation like this was unlikely to reoccur based on defendant's conduct while in custody. While sober in jail, defendant had enrolled in general equivalency diploma (GED) preparation courses, completed numerous vocational courses, and was on track to obtain his GED. Defense counsel argued defendant's actions while in jail should inform the court as to his rehabilitative potential. Further, based on defendant's rehabilitative potential, defense counsel asked the trial court to consider a sentence closer to 45 years on the murder conviction followed by a consecutive

2-year sentence on the weapon conviction.

¶ 44     The trial court responded the defense only wanted the court to consider defendant's actions while in custody and not while he was free. The court also indicated defendant had opportunities to maintain sobriety in the past, including after he served six months in jail, but failed to do so.

¶ 45     Defendant provided a statement to the trial court. Other than saying, "I'm sorry for us being here," defendant mainly discussed the evidence in the case and why the State did not prove he murdered the victim. The court occasionally asked him questions during his statement. For example, at one point, the court asked defendant whether he told the police he fought his uncle. Defendant said he did fight with his uncle because of Cottrell Mackey. Defendant asserted Mackey killed the victim and set defendant up to take the blame. The court then asked defendant if Mackey made defendant fight his uncle. Defendant responded:

> "He didn't do anything. He just—they just was arguing, and I just was like, [']hold on, uncle. You're tripping.['] Then he's all like, [']you're sticking up for him.['] And, like, it was, like, little things between them. So that's what made me, you know, try to get in the middle of it. This what everybody needs to know. He decided to do whatever he did.
>
> There's no evidence whatsoever I committed no murder. Yeah, we got into a little stabbing or whatever, you know, a little family issue, a little aggravated domestic battery. Whatever it was. But a murder, I didn't commit no murder."

The court then interjected, "All you did was a little stabbing?" Defendant responded he did not "know that even occurred," although he admitted he had a knife. Defendant asserted he and the victim talked several times while the victim was at the hospital, and they were "cool." In fact,

defendant said the victim called him later and wanted some drugs.

¶ 46　　　　Defendant acknowledged he had a drinking problem but was a "happy drinker." In addition, he asserted he had taken some 12-step substance abuse classes while in jail before the programs were stopped because of COVID-19. According to defendant, he started to remember things that happened on the day of his uncle's murder when he felt sober. Defendant stated he thought his trial might have gone differently if Mackey had been there to testify.

¶ 47　　　　The trial court indicated it had considered the PSI, the evidence presented, the arguments of the parties, defendant's statement, the financial impact of incarceration, statutory mitigating and aggravating factors, defendant's history, character, education, and employment history, statements on defendant's behalf, his rehabilitation, and the nature and circumstances of the offense in this case. After finding no statutory mitigating factors applied, the court noted defendant's criminal history and the need to deter others were applicable statutory aggravating factors. In addition, the court found defendant's rehabilitation prospects were not good and his statement in allocution did not enhance his prospects. The court then sentenced defendant to life in prison for first degree murder and a consecutive six-year sentence for unlawful possession of a weapon by a felon.

¶ 48　　　　This appeal followed.

¶ 49　　　　　　　　　　　　　　　II. ANALYSIS

¶ 50　　　　　　　　　　　　　　A. Motion to Suppress

¶ 51　　　　Defendant argues the trial court erred in denying his motion to suppress for two reasons. First, defendant asserts he was in custody at the police station while speaking to the police detectives before the detectives informed him of his *Miranda* rights. Second, although defendant continued to talk to the detectives after they advised him of his *Miranda* rights, defendant contends

- 14 -

his statements should have still been suppressed because he alleges the detectives deliberately used a "question first, warn later" interrogation tactic on him.

¶ 52        When reviewing a trial court's ruling on a motion to suppress, we apply a two-part standard of review. *People v. Hunt*, 2012 IL 111089, ¶ 22, 969 N.E.2d 819. We will not disturb the trial court's factual findings unless they are against the manifest weight of the evidence. *Hunt*, 2012 IL 111089, ¶ 22. However, the court's ultimate determination whether suppression is warranted is reviewed *de novo*. *Hunt*, 2012 IL 111089, ¶ 22.

¶ 53        We first address defendant's argument he was in custody at the police station when he told the detectives he and the victim "got into it" before the victim was killed. Prior to a custodial interrogation, the police must inform the individual in custody of his *Miranda* rights. To determine whether an individual is in custody for *Miranda* purposes, a court must examine the circumstances surrounding the interrogation and, given those circumstances, whether a reasonable person would have felt free to terminate the interrogation and leave. *People v. Braggs*, 209 Ill. 2d 492, 505-06, 810 N.E.2d 472, 481 (2003).

> "[T]he following factors have been found relevant in determining whether a statement was made in a custodial setting: the location, time, length, mood, and mode of the interrogation, the number of police officers present, the presence or absence of the family and friends of the accused, any indicia of formal arrest, and the age, intelligence, and mental makeup of the accused." *Braggs*, 209 Ill. 2d at 506.

As for whether a reasonable person would have felt free to leave, "the accepted test is what a reasonable person, innocent of any crime, would have thought had he or she been in the defendant's shoes." *Braggs*, 209 Ill. 2d at 506.

¶ 54    Defendant's brief did not contain a significant amount of analysis addressing the trial court's conclusion defendant was not in custody when he told the detectives he and the victim "got into it" prior to the victim's murder. According to defendant, he was in custody the moment he was escorted into the interview room at the police station. Defendant concedes the police did not bring him to the police station. However, he asserts his mother told him the police wanted to talk to him. He then spoke with a police officer on the phone. According to defendant, the detective did not tell him he did not have to speak with the police. Further, defendant argues the detective made it seem like he did not have a choice whether to talk to the police. In other words, defendant was going to talk to the police at the station or where he was located. Defendant asserts in his brief:

> "Under these circumstances, with detectives contacting [his] parents in an attempt to find him and then telling him 'come to us or we will come to you,' no reasonable person in Anthony's position would feel they were free to refuse to surrender themselves to police custody. [Citation.] Nor, once placed in a secure interrogation room in the middle of a police station and subjected to questioning, would any such person reasonably feel free to remain silent and walk away."

We disagree.

¶ 55    Based on the record in this case, the trial court did not err in determining defendant was not in custody prior to defendant telling the officer he and the victim "got into it" before the victim was murdered. Defendant came to the police station on his own. While it appears defendant may have been waiting somewhere in the police station for approximately an hour before the detectives met with him, he was not confined in the interview room during that period of time. Defendant was only in the interview room by himself before the interview for under two minutes. He was asked if he wanted anything to drink and was given water at his request. The video

recording of the interview shows defendant was not handcuffed and was allowed to keep his cell phone and made a call. He was also allowed to keep his shoes and his belt with him, which was common practice for witnesses. In addition, the interview was not adversarial. The police officers essentially asked defendant what he wanted to talk to them about and asked a few clarifying and follow-up questions while defendant was providing the officers with information as to who he thought may have killed the victim. Nothing the police officers did would have given a reasonable person any indication he was not free to leave the police station at any time. Further, the interview only lasted approximately seven minutes before the detectives told defendant they were going to provide him with his *Miranda* rights.

¶ 56    We next turn to defendant's argument the police used a "question first, warn later" interrogation technique. Courts are critical of this technique when it is used to subvert *Miranda*. Defendant relies heavily on *People v. Lopez*, 229 Ill. 2d 322, 892 N.E.2d 1047 (2008), to support his argument his motion to suppress should have been granted because the police used this technique during his interview.

¶ 57    In *Lopez*, the Illinois Supreme Court discussed the United States Supreme Court's decision in *Missouri v. Seibert*, 542 U.S. 600 (2004). In *Seibert*, the defendant was arrested for murder and interrogated before receiving *Miranda* warnings. *Seibert*, 542 U.S. at 605. After the defendant made an incriminating statement, the police stopped the interview, took a 20-minute break, started a tape recorder, and then provided *Miranda* warnings. *Seibert*, 542 U.S. at 605. The defendant then signed a written waiver of his *Miranda* rights, and the interrogating officer questioned the defendant using information the defendant had provided before the *Miranda* warnings were given. *Seibert*, 542 U.S. at 605.

¶ 58    At a hearing to suppress the defendant's statements in *Seibert*, the interrogating

officer admitted " 'he made a "conscious decision" to withhold *Miranda* warnings, thus resorting to an interrogation technique he had been taught: question first, then give the warnings, and then repeat the question "until I get the answer that she's already provided once." ' " *Lopez*, 229 Ill. 2d at 357 (quoting *Seibert*, 542 U.S. at 605-06).

¶ 59 Justice Souter authored a plurality opinion, holding the "question first, warn later technique utilized by the officer rendered the resulting statement inadmissible." *Seibert*, 542 U.S. at 617. According to the Illinois Supreme Court:

"The plurality *** created a new test to determine whether warnings delivered after questioning could be effective enough to protect a suspect's rights. The test required consideration of 'the completeness and detail of the questions and answers in the first round of interrogation, the overlapping content of the two statements, the timing and setting of the first and the second, the continuity of police personnel, and the degree to which the interrogator's questions treated the second round as continuous with the first.' *Seibert*, 542 U.S. at 615. *Applying this test to the facts before it, the plurality determined that the statements made by the defendant were obtained through a police strategy designed to undermine Miranda and were thus inadmissible*.

Justice Kennedy wrote a concurrence agreeing with the plurality's overall decision that the two-step interrogation technique utilized by the officer was improper. However, Justice Kennedy concluded that the test fashioned by the plurality, which 'envisions an objective inquiry from the perspective of the suspect, and applies in the case of both intentional and unintentional two-stage interrogations[,] *** cuts too broadly.' *Seibert*, 542 U.S. at 621-22 (Kennedy, J.,

- 18 -

concurring). *Justice Kennedy proposed a 'narrower test applicable only in the infrequent case \*\*\* in which the two-step interrogation technique was used in a calculated way to undermine the Miranda warning*.' *Seibert*, 542 U.S. at 622 (Kennedy, J., concurring). Under Justice Kennedy's test, the principles of *Elstad* would govern admission of statements made without the benefit of *Miranda* warnings unless the evidence demonstrated that police officers deliberately employed a question first, warn later interrogation strategy. If that strategy was deliberately used, statements taken after *Miranda* warnings would be excluded unless 'curative measures were taken,' such as a substantial break in time and circumstances between the statements, that would allow the accused 'to distinguish the two contexts and appreciate that the interrogation has taken a new turn.' *Seibert*, 542 U.S. at 622 (Kennedy, J., concurring)." (Emphases added.) *Lopez*, 229 Ill. 2d at 358-59.

The Illinois Supreme Court has adopted the analysis found in Justice Kennedy's concurrence. *Lopez*, 229 Ill. 2d at 360.

¶ 60        In this case, we do not need to determine whether the detectives used a "question first, warn later" interrogation technique because defendant was not in custody before the detectives provided him with *Miranda* warnings. The detectives in this case did not need to provide defendant with *Miranda* warnings initially because he was not in custody. As a result, the detectives were not undermining *Miranda* by questioning defendant without warnings before he was in custody.

¶ 61        The facts in this case are easily distinguishable from the facts in *Lopez* on the issue of custody. The defendant in *Lopez* was found to have voluntarily come to the police station

(*Lopez*, 229 Ill. 2d at 352) like the defendant here. However, the similarities end there. In *Lopez*, the defendant was 15 years old. *Lopez*, 229 Ill. 2d at 362. The police escorted him to the station without a parent. He was placed in an interrogation room at the police station at 1 p.m., where he was questioned and told he had been implicated in a murder. The juvenile provided the detectives with information and was then left by himself in the interview room, with the door closed, for four to five hours while the detectives continued to investigate the murder. *Lopez*, 229 Ill. 2d at 362. While the juvenile was not handcuffed and the door to the room was unlocked, he was not allowed to leave the room without an escort and was never told he was free to leave the police station. *Lopez*, 229 Ill. 2d at 362. At 6 p.m., the same detectives questioned the defendant again, informing the juvenile he had been implicated in the murder again by the same person and that person had admitted his own involvement in the murder. *Lopez*, 229 Ill. 2d at 362.

¶ 62 Without providing *Miranda* warnings to the juvenile, the detectives asked him whether he was involved in the murder. After the juvenile confessed, the detectives provided him with his *Miranda* warnings. *Lopez*, 229 Ill. 2d at 362. Noting one of the detectives indicated the juvenile would not have been free to leave the station based on information the detectives received before questioning him at 6 p.m., the Illinois Supreme Court stated: "[W]e can think of no legitimate reason why the detectives failed to give defendant his *Miranda* warnings prior to the 6 p.m. confrontation, other than a deliberate decision to circumvent *Miranda* in hopes of obtaining a confession, which would ultimately lead to a handwritten statement." *Lopez*, 229 Ill. 2d at 363-64.

¶ 63 Based on the facts here, defendant was not in custody before he was informed of his *Miranda* rights, which he was given seven minutes after he started talking to the officers. Further, we see no reason why the detectives could have detained him at that time based on the

information they had. We need not address defendant's "question first, warn later" argument any further. Because defendant was not in custody prior to being Mirandized, the detectives did not undermine *Miranda* by talking to defendant without advising him of his *Miranda* rights. Therefore, the trial court did not err in denying defendant's motion to suppress.

¶ 64                                    B. *Brady* Violation

¶ 65        Defendant next argues the State failed to identify and disclose material, exculpatory evidence in its possession to defendant's trial counsel, violating his right to due process pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963). Citing *Kyles v. Whitley*, 514 U.S. 419, 433 (1995), defendant contends that "[b]ecause the State failed to identify and disclose material, exculpatory evidence (including, but not likely limited to the full video from the gas station parking lot), the ensuing conviction was obtained in violation of [defendant's] right to due process." As a result, defendant asks this court to vacate his conviction and remand for a new trial.

¶ 66        This court has stated that for a defendant to receive a new trial pursuant to *Brady*, the defendant must show the State suppressed evidence, the evidence was favorable to defendant, and the evidence was material to his guilt or punishment. *People v. Snow*, 2012 IL App (4th) 110415, ¶ 35, 964 N.E.2d 1139 (citing *Kyles*, 514 U.S. at 433).

> "A *Brady* claim may arise in the following three circumstances: (1) where previously undisclosed evidence reveals the prosecution introduced trial testimony it knew or should have known was perjured, (2) where the State fails to comply with a defense request for disclosure of some specific exculpatory evidence, and (3) where the State fails to voluntarily give the defense exculpatory evidence never requested or requested only in a general manner." *Snow*, 2012 IL App (4th) 110415, ¶ 35.

Defendant fails to specify which circumstance is applicable to this case. However, based upon defendant's arguments, it appears his claim would fall under either the second or third circumstance.

¶ 67       Relying on *Kyles*, 514 U.S. at 433-34, this court has noted, "favorable evidence is material if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different" and "[a] reasonable probability of a different result exists when the State's evidentiary suppression undermines confidence in the outcome of the trial." (Internal quotation marks omitted.) *Snow*, 2012 IL App (4th) 110415, ¶ 36.

¶ 68       A trial court's ruling regarding whether a *Brady* violation occurred is reviewed for manifest error and will only be reversed where the court's error is "clearly evident, plain, and indisputable." (Internal quotation marks omitted.) *People v. Beaman*, 229 Ill. 2d 56, 73, 890 N.E.2d 500, 510 (2008). Based on the record, defendant has failed to establish the State neglected to turn over anything to the defense that was material or that a reasonable probability exists the result of the case would have been different had defendant been given that evidence. The State argued that defendant was given the full video. Officer Linthicum testified the video clips show all the video of defendant and the victim. Although defendant claims the police had a video recording from the gas station that he did not receive in its entirety, defendant apparently failed to obtain the full video from the police after learning about it during defendant's trial for purposes of his posttrial motion. As a result, neither the trial court nor this court can determine whether anything on the part of the video defendant claims he was not provided was material to the case.

¶ 69       Defendant rightfully points out the trial court erred by indicating the prosecutor only had a duty to turn over the evidence that was provided to him by the police. The Illinois Supreme Court had stated, "the prosecution cannot escape its duty under *Brady* by contending that

the suppressed evidence was known only to police investigators and not to the prosecutors." *People v. Page*, 193 Ill. 2d 120, 159, 737 N.E.2d 264, 285 (2000). Regardless, we can affirm a trial court's decision for any reason found in the record. *Baumgartner v. Green County State's Attorney's Office*, 2016 IL App (4th) 150035, ¶ 41, 52 N.E.3d 654.

¶ 70　　　　As stated above, defendant failed to establish the State did not turn over material evidence to the defense. As a result, we do not find the trial court's decision to deny defendant's claim the State committed a *Brady* violation was manifestly erroneous.

¶ 71　　　　　　　　　　　　　　C. Sentence

¶ 72　　　　Defendant next argues the trial court abused its discretion by imposing a natural life sentence on his first degree murder conviction. Defendant contends a natural life sentence is objectively excessive. While acknowledging murder is a serious offense, defendant asserts the circumstances of this particular offense and the general weakness of the State's evidence did not warrant a natural life sentence. Defendant asks this court to vacate his sentence and remand this case for a new sentencing hearing.

¶ 73　　　　Defendant concedes he forfeited his sentencing challenge on appeal because he did not file a motion to reconsider his sentence in the trial court. See Illinois Supreme Court Rule 605(a)(3)(C) (eff. Oct. 1, 2001). However, defendant asks this court to consider his arguments pursuant to the plain-error doctrine.

¶ 74　　　　The Illinois Supreme Court has held "[t]he plain-error doctrine is a narrow and limited exception" to forfeiture. *People v. Hillier*, 237 Ill. 2d 539, 545, 931 N.E.2d 1184, 1187 (2010). For the plain-error rule to provide relief, a defendant must first establish a clear or obvious error occurred. *Hillier*, 237 Ill. 2d at 545. "In the sentencing context, a defendant must then show either that (1) the evidence at the sentencing hearing was closely balanced, or (2) the error was so

egregious as to deny the defendant a fair sentencing hearing." *Hillier*, 237 Ill. 2d at 545. A defendant has the burden of persuasion under either prong of the plain-error doctrine. *Hillier*, 237 Ill. 2d at 545. "If the defendant fails to meet his burden, the procedural default will be honored." *Hillier*, 237 Ill. 2d at 545.

¶ 75 Defendant alleges the trial court erred by (1) arbitrarily determining without evidence defendant could not maintain sobriety unless he was incarcerated, (2) stating defendant, who was 27 when the murder occurred, was in a gang when the murder occurred when evidence showed he had not been affiliated with a gang since he was 20, (3) interrupting defendant's statement in allocution to cross-examine and deride him, (4) penalizing defendant for exercising his rights to trial, allocution, and an appeal in which he maintained his innocence, and (5) disregarding uncontested evidence both defendant and the victim suffered from substance abuse problems and were both intoxicated on the night in question to conclude substance abuse did not play a significant part in the murder. Defendant's brief fails to establish any of these criticisms amount to clear or obvious errors.

¶ 76 After reviewing the transcript of the sentencing hearing and considering defendant's argument, the trial court did not arbitrarily determine defendant could not maintain sobriety unless he was incarcerated. Instead, the court essentially noted the only time defendant had been able to maintain sobriety was when he was incarcerated. The evidence showed defendant had not been able to maintain sobriety after a prior six-month period of incarceration.

¶ 77 Further, it is not clear the trial court thought defendant was in a gang at the time of the murder. The court did indicate the PSI said defendant is in a gang, which defense counsel did not correct. However, before sentencing defendant, when the court was discussing defendant's history, the court indicated defendant "was" a gang member. The court's statement was made in

the following sentence: "He does not have a job but has four children, was a gang member, bad, bad, bad, bad." If the court thought defendant was currently in a gang, we presume the court would have said, "He does not have a job but has four children, *is* a gang member, bad, bad, bad, bad."

¶ 78 The trial court did interrupt defendant and ask him questions. However, defendant has failed to establish this was improper. Defendant cites *People v. Kokoraleis*, 132 Ill. 2d 235, 281, 547 N.E.2d 202, 224 (1989), for the proposition a statement in allocution is not subject to cross-examination. However, defendant does not explain how questions from the court amount to cross-examination. In *People v. Iseminger*, 202 Ill. App. 3d 581, 599, 560 N.E.2d 445, 456 (1990), this court rejected an argument that a trial court at a sentencing hearing may not question a defendant unless he has either testified or exercised his right of allocution. This court indicated a defendant is often the best source of information for sentencing purposes and it makes no sense to cut trial courts off from questioning their best source of information. *Iseminger*, 202 Ill. App. 3d at 599.

¶ 79 As for defendant's argument the trial court penalized defendant for exercising his rights to a trial, a statement in allocution, and an appeal, we see nothing in the record indicating the court increased defendant's sentence merely because he maintained his innocence.

¶ 80 Finally, as to defendant's assertion the trial court disregarded uncontested evidence both defendant and the victim suffered from substance abuse problems and were both intoxicated on the night of the murder, defendant gives no analysis or explanation of what the court should have done but did not do.

¶ 81 As a result, defendant has failed to establish the trial court made any clear or obvious errors regarding factors it considered when sentencing defendant.

¶ 82 Turning to the sentence itself, defendant cannot establish the trial court committed

a clear or obvious error by imposing a natural life sentence on defendant. Trial courts have wide latitude to determine what is an appropriate sentence, and we will not reverse a sentence absent an abuse of the court's discretion. *People v. Snyder*, 2011 IL 111382, ¶ 36, 959 N.E.2d 656. "[T]he trial court is in a better position to judge the credibility of the witnesses and the weight of the evidence at the sentencing hearing." *People v. Ramos*, 353 Ill. App. 3d 133, 137, 817 N.E.2d 1110, 1115 (2004). It is not this court's role to substitute our judgment for the trial court's merely because we may have weighed the factors in the case differently. *People v. Fern*, 189 Ill. 2d 48, 53-54, 723 N.E.2d 207, 209-10 (1999). Moreover, "[a] sentence which falls within the statutory range is not an abuse of discretion unless it is manifestly disproportionate to the nature of the offense." *People v. Franks*, 292 Ill. App. 3d 776, 779, 686 N.E.2d 361, 363 (1997). Defendant does not argue the sentences he received fell outside the statutory sentencing range.

¶ 83            Based on the record, the trial court's sentencing decision was not a clear or obvious error. A natural life sentence is not disproportionate to the nature of the murder defendant was convicted of committing. In sentencing defendant, the court found no statutory mitigating factors applied. However, the court did find defendant's criminal history was an aggravating factor and also indicated it needed to deter others from committing similar offenses. Defendant was not new to the criminal justice system. He had prior felony convictions for aggravated unlawful use of a weapon, aggravated battery of a peace officer, and unlawful possession of a controlled substance.

¶ 84            The trial court also found defendant's rehabilitative potential was poor. Based on the record, we do not disagree. In addition to defendant's criminal history, defendant's statement in allocution supports the court's determination regarding defendant's rehabilitation potential. For example, in his statement in allocution, defendant admitted he and his uncle got into a knife fight before his uncle was murdered. However, according to defendant, the fact he cut his uncle in a

manner requiring medical attention was not a serious matter. Defendant stated: "There's no evidence whatsoever I committed no murder. Yeah, we got into a little stabbing or whatever, you know, a little family issue, a little aggravated domestic battery. Whatever it was. But a murder, I didn't commit no murder." Defendant's attitude about a knife fight strongly supports the court's sentencing decision in this case.

¶ 85    In addition, we note defendant's statement in allocution focused on why he should not have been convicted of his uncle's murder. While a defendant cannot be given a more severe sentence simply for refusing to abandon his claim of innocence, a trial court may consider a defendant's lack of remorse when imposing a sentence because a defendant's lack of remorse could have an impact on his rehabilitative potential. *People v. Donlow*, 2020 IL App (4th) 170374, ¶ 84, 178 N.E.3d 1148. As stated earlier, the record does not indicate the trial court improperly imposed a more severe sentence on defendant because he refused to abandon his claim of innocence. However, the fact defendant showed no remorse for his uncle or concern for his own children or his uncle's daughter, especially after Mary McFadden testified the victim's daughter had been devastated by her father's murder, provides additional support for both the court's determination defendant's prospects for rehabilitation were minimal and the court's sentencing decision.

¶ 86                                III. CONCLUSION

¶ 87    For the foregoing reasons, we affirm the trial court's judgment.

¶ 88    Affirmed.