NOTICE

Decision filed 04/20/26. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2026 IL App (5th) 240522-U

NO. 5-24-0522

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Champaign County. |
| | ) | |
| v. | ) | No. 23-CF-701 |
| | ) | |
| JONATHAN E. FULLER, | ) | Honorable |
| | ) | Randall B. Rosenbaum, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE HACKETT* delivered the judgment of the court.
Justices Barberis and Vaughan concurred in the judgment.

**ORDER**

¶ 1      *Held*: The trial court's order sentencing the defendant to six and one half years of incarceration on his simple arson conviction is affirmed where the trial court did not consider improper aggravating factors in fashioning the defendant's sentence.

¶ 2      Following a bench trial, the defendant, Jonathan E. Fuller, was convicted of one count of simple arson, a Class 2 felony. 720 ILCS 5/20-1(a) (West 2022). The defendant had originally been charged on June 5, 2023, with five felonies: one count of being an armed habitual criminal (*id.* § 24-1.7(a)), one count of armed violence (*id.* § 33A-2(a)), one count of residential arson (*id.* § 20-1(b)), one count of unlawful possession of a weapon by a felon (*id.* § 24-1.1(a)), and one count of possession of a stolen firearm (*id.* § 24-3.8(a)), all in relation to an incident which took

_____

*Justice Welch was originally assigned to the panel. Justice Hackett was later substituted on the panel and has read the briefs.

1

place on June 4, 2023, near Tennyson Courtyard Apartments in Urbana. Prior to trial, on January 24, 2024, the State dismissed the possession of a stolen firearm count.

¶ 3 The defendant's bench trial took place on January 25, 2024. At the close of the evidence, the parties agreed to add the simple arson charge to the defendant's indictment as a lesser included offense of the original residential arson charge. The trial court found the defendant guilty of simple arson and acquitted him on all other charges. At sentencing, the trial court sentenced the defendant to six and one half years of incarceration on his simple arson conviction.

¶ 4 On appeal, the defendant argues that this court must either reduce his sentence or vacate the trial court's sentencing order and remand for resentencing proceedings where the trial court relied on improper sentencing factors, namely, the threat of harm posed by the defendant's arson and the possession of firearm evidence presented at trial. For the following reasons, we affirm.

¶ 5

## I. BACKGROUND

¶ 6 At trial, the following evidence was adduced. Lieutenant Blake Kuhns of the Urbana Fire Department testified that, at about 9:53 a.m. on June 4, 2023, he was dispatched to Tennyson Courtyard Apartments in Urbana in response to a call about small fires set around the apartment building. Upon arrival, Lieutenant Kuhns and his coworkers found several small fires spread around the area. The firefighters extinguished the fires with a small fire extinguisher pump. As they did not see anyone in the area, there was no suspected source identified at that time. They met with the Urbana Police Department on the scene and then left the area to get fuel. Subsequently, Officer Jeffers of the Urbana Police Department called Lieutenant Kuhn's cell phone to have the firefighters return to the area because there was a large fire on an evergreen bush directly outside the means of egress at Tennyson Courtyard Apartments. While clearing that fire, the firefighters

2

saw a male in a black shirt carrying a black plastic bag walking in the grassy area and informed Officer Jeffers. Lieutenant Kuhns was able to conclude, upon investigation, that the fires in the area were caused by intentional human involvement. This finding was consistent with the fact that multiple small fires had been set at different points throughout the area and was confirmed by the video evidence that officers were later able to review. Lieutenant Kuhns confirmed that "the first material ignited would have been the cottonwood tree like debris" that was "spread all across the ground" in that area. This debris was extremely flammable and had built up in piles in that area, which led to more intense burning when ignited.

¶ 7     Lieutenant Kuhns confirmed that every apartment building in the area was residential, that some discoloration damage had been done by the fires to a conduit that was attached to the building, and that the bush had suffered significant damage. Photographs depicting this damage and damage caused to the landscaping near the Tennyson Courtyard Apartments building, were admitted into evidence.

¶ 8     Mohsen Hosseinpour Motlagh testified that on June 4, 2023, he lived in an apartment at The Pointe Apartments on East Florida Avenue. At around 9:45 a.m. that morning, he was driving to the grocery store with his wife when he saw a man bending down and starting a fire on the grass near the apartment buildings' sidewalk. Motlagh confirmed that this incident was captured on video by his dashboard mounted video camera. This recording was admitted to and played for the court. The video depicted Motlagh's car waiting to drive through a gate, and a man in a black shirt and black hat on the other side of the gate bending down and using a cigarette lighter to start a fire on the grass. Motlagh testified that the grass was dry since it was summer, and that he saw smoke behind the man. Motlagh called the police and then went to the grocery store. After about 5 to 10 minutes, the police called Motlagh and asked him to come back to the apartment area, where they

3

spoke with him and had him identify the defendant by the clothes the defendant was wearing. The State submitted body-worn camera footage from Officer DeDecker of the Urbana Police Department and played part of this footage for the court. The played footage depicted the defendant standing behind a tree and then being handcuffed.

¶ 9 Sergeant Eric Ruff of the Urbana Police Department testified that, at about 9:53 a.m. on June 4, 2023, he was dispatched to The Pointe Apartments to assist with a fire call. Upon arrival, Sergeant Ruff and his coworkers saw that the Urbana Fire Department had extinguished a fire, were clearing the scene, and were leaving. Sergeant Ruff and his coworkers canvassed the area to try to locate the person suspected of starting the fire but were unsuccessful in doing so. After the fire department left, and as they themselves were leaving, Sergeant Ruff and his coworkers saw that an open area field was ablaze at the Tennyson Courtyard Apartments, and this fire was creeping towards one of the apartment buildings. Sergeant Ruff asked the fire department to return to the scene. With an extinguisher from his squad car, he then extinguished the fire, which was closing in on an electrical box on the exterior of the building. Sergeant Ruff testified that he noticed that the electrical box appeared to be beginning to melt.

¶ 10 After other officers on the scene saw a potential suspect running in the area, they set up a perimeter to locate the individual. Eventually, the suspect was located behind a tree next to a maintenance shed inside the complex. The suspect, who was identified as the defendant, was detained but was not cooperative. Upon searching the defendant incident to arrest, Sergeant Ruff found an Illinois identification card, a black lighter on a key lanyard attached through a belt loop on the defendant's trousers, and a small cannabis bag in his back pocket containing seven rounds of Norma .38 Special and Federal .38 Special ammunition. Sergeant Ruff did not initially realize that the cannabis bag contained ammunition and not cannabis. He only discovered the ammunition

4

inside the bag later. Sergeant Ruff placed these items in a paper bag in a squad car to be transported to the police department. Sergeant Ruff then contacted Motlagh to have him identify the defendant. Since the defendant was uncooperative in showing his face, Motlagh identified the defendant only by his clothing.

¶ 11   The State played Sergeant Ruff's body-worn camera footage. The footage depicted Sergeant Ruff using a fire extinguisher on landscaping on the side of a building and running to assist Officer DeDecker in handcuffing the defendant. While handcuffing the defendant, Sergeant Ruff pulled several items out of the defendant's pants pockets, including the cannabis bag. The defendant repeatedly denied starting the fires, resisted arrest, and, when later detained in the police vehicle, vehemently denied that the cannabis bag recovered from his pocket belonged to him. The defendant then told Sergeant Ruff that he did not "know what the **** that is" and that Sergeant Ruff "picked that up off the grass." At another officer's assertion that something other than marijuana was probably in the bag, Sergeant Ruff opened the cannabis bag and dumped its contents, several rounds of .38 Special ammunition, into his gloved palm.

¶ 12   Officer Joshua Jeffers of the Urbana Police Department testified that at about 9:55 a.m. on June 4, 2023, he was dispatched to The Pointe Apartments to assist with a fire call. Before the officers arrived on the scene, they had been provided with a description of the suspect. Upon arrival, Officer Jeffers began checking the area which contained multiple apartment complexes. Officer Jeffers saw the defendant on the sidewalk right next to one of the apartment buildings. The defendant matched the description of the suspect, in that he was a black male wearing a black hat with a black shirt. Officer Jeffers observed that the defendant was carrying several bags. As Officer Jeffers exited his squad car and walked toward the defendant, the defendant ran to the other side of the building. While following the defendant, Officer Jeffers noticed that the grass was on fire

5

near the sidewalk where the defendant had been standing. The fire was "spread out pretty far" and was "moving very quickly across the grass." Since the fire was traveling extremely quickly, and because no one else was present in the immediate area, Officer Jeffers concluded that the defendant had started the fire, although Officer Jeffers admitted that he did not actually see anyone set any fires.

¶ 13 As Officer Jeffers followed the defendant behind the apartment building, he saw a black cap lying on the ground near an apartment building doorway. Officer Jeffers then saw the defendant across from another building and tried to catch up with him. Officer Jeffers lost sight of the defendant and communicated via radio to other officers in the area where he had last seen the defendant. Upon discovering the defendant, Officer Jeffers noticed that the defendant was not wearing a hat. Afterwards, Officer Jeffers returned to retrieve the black cap and found a black Nike satchel bag lying next to the bush to the left of the apartment building doorway. Officer Jeffers searched inside this bag with gloves on and found a Rock Island Revolver gun loaded with six rounds of .38 Special ammunition. The State then played the officer's body worn camera footage for the court, which confirmed his testimony. On cross-examination, Officer Jeffers admitted that he did not actually see anyone set any fires. Despite evidence collection protocol requiring evidence to be initially secured in a paper or plastic bag, he had initially secured the weapon and bullets inside the black hat found on the ground. Officer Jeffers also admitted that nothing with the defendant's information on it was located inside the black Nike satchel bag or cap, and that he found no other bags in the area despite previously seeing the defendant carrying "multiple bags."

¶ 14 Officer Gicelle Camacho of the Urbana Police Department testified that, at about 9:55 a.m. on June 4, 2023, she assisted in the fire call investigation at The Pointe Apartments. Officer Camacho's role was to locate and apprehend the suspect and photograph and process evidence.

6

Officer Camacho testified that she swabbed the firearm for DNA. On cross-examination, Officer Camacho clarified that she had taken the DNA swabs from the firearm on June 12, 2024.

¶ 15 Lauren Hollinshead, a latent print forensic science specialist at the Illinois State Police (ISP), testified that she examined the Rock Island Armory Revolver and recovered one latent print from the revolver's frame, near the cylinder. Hollinshead was able to conclude that the latent print from the revolver matched the defendant's left thumb print.

¶ 16 Dana Pitchford, a forensic biology and DNA analysis forensic science specialist at ISP, testified that, upon receiving swabs for DNA that had been taken from the grip of a firearm in this case, she was able to recover a DNA sample suitable for analysis. She compared that sample to a known standard of the defendant's DNA and found that the results from the swab were a mixture of three contributors. Pitchford was able to conclude that it was 45 million times more likely that the mixture consisted of DNA from the defendant and two unknown contributors than from three unknown contributors. Pitchford testified that although part of the mixture could have been transfer DNA, which occurred when DNA was left on an item and then came into contact with another item, the transferred DNA was least likely to be from the major contributor to the mixture. In this case, the major contributor was the defendant.

¶ 17 On cross-examination, Pitchford admitted that a transfer DNA scenario could occur where an object was placed inside of an item of clothing that a person had worn, such as in this case, where the handgun was placed inside the black hat. Pitchford denied that the transfer of a mixture's major contributor's DNA would be possible through skin cells alone but acknowledged that such a transfer would be possible through bodily fluids such as sweat.

¶ 18 At the close of the State's evidence, the defendant moved for a directed verdict on all counts. The State submitted that this was "one of the weaker cases" of residential arson but asked

7

the trial court to "consider the lesser included offense of arson" if it found that the elements of residential arson had not been met. Both the State and the court insisted that there was sufficient evidence to prove that the defendant possessed the firearm. The court then commented that

> "With respect to counts one and four, I think it's clear there is sufficient evidence to suggest that the defendant possessed the weapon. There were—there was ammunition on him. This bag had a weapon, and it was loaded with ammunition of the same caliber. The defendant was seen in this area. He had previously been seen with a cap on. And one witness thought that he had one bag. Another witness said that they had several bags. This hat was found relatively close to where the bag was with the gun in it. Although the defense will certainly argue problems with the DNA contamination, so to speak, I do believe that a reasonable trier of fact could conclude the guilt of the defendant on counts one and four."

The court denied the defendant's motion for a directed verdict on all counts.

¶ 19　The defendant testified that on June 4, 2023, while walking in front of the gate, during which time he was captured on video by Motlagh's dashboard camera, he was holding a small plastic bag from the gas station, which contained soda and a bag of chips. The defendant denied at any time having the black Nike bag within which the firearm had been found, although he admitted seeing the black Nike bag and the cannabis bag inside a bush when he approached the Tennyson Courtyard Apartments building, where his friend lived. The defendant testified that he picked up the cannabis bag and quickly put it in his pocket without opening it, believing that it contained cannabis. He then grabbed the black Nike bag, pulled it out of the bush, reached his hand inside of it, and felt for its contents. When he felt the firearm, he immediately dropped the bag again. The defendant testified that he then went inside the building to meet his friend, stayed for approximately five minutes, threw away his plastic bag inside the building, and left thereafter, with only his bottle of soda and the cannabis bag. Upon leaving the apartment building, he saw a police vehicle. When he saw an officer walking toward the apartment complex, he sprinted to the other side of the building because he had warrants. As he ran, he lost his hat. The defendant was beside a tree when he was ultimately arrested.

¶ 20    On cross-examination, the defendant admitted that he did start fires that day. The defendant testified that he did so because he had pollen allergies, the pollen had built up, and he just "wasn't thinking." The defendant denied knowing or suspecting that the fires he had started had spread or intending to set any buildings on fire. He believed the small fires that he had started were "just gonna light and go out" since he had seen some of them do just that. The defendant also denied thinking that the cannabis bag was heavier than it should have been, or having any knowledge that ammunition was inside the cannabis bag, or ever touching the wooden grip of the gun. At the close of the evidence, the State and the defendant agreed that the court could consider arson as a lesser included offense of the residential arson charge.

¶ 21    The trial court made an oral ruling acquitting the defendant of all charges except the simple arson charge. The court explicitly found that the testifying police officers "all were telling the truth," and expressed its belief that the defendant's testimony was "a little unbelievable." On its decision to nevertheless acquit the defendant of the unlawful possession of a weapon by a felon charge, the court commented:

> "The issue for the court is whether or not the defendant possessed the firearm. No one saw the defendant with this bag. Even the eyewitness who videotaped it, the videotape doesn't show the defendant holding this bag. The state is arguing supposition that [the defendant] was doing bad acts, setting little fires and left this bag somewhere hidden, I suppose, because he didn't want to get caught with the gun while he's committing other offenses. It's speculative.
> But, on the other hand, we have a fingerprint on the gun that matches the defendant, and we have DNA. I do have some concerns about the police not following the protocols, and his DNA was found on the gun, but it's a mixed bag because he says he didn't touch the grip, which is where the DNA was. The DNA person said you generally wouldn't get to be the major contributor if it's by transfer, and this would have arguably been sweat in the hat, not like blood or semen where there could be large volumes of it. So we're kind of split on the DNA, which way it would go, could cut either way, but we're left with the fingerprint. And defendant didn't say he touched the area where his fingerprint was. Fingerprints, there's no evidence that that can be transferred, so he touched the gun. And the defendant testified he touched the gun, and when he realized it was a gun, he dropped it.

9

The defendant comes up with his version, which I'm not confident is truthful, which is he stumbled across it, didn't really look in it, felt what he thought was a gun, dropped it and, and left. If that's true, is putting one finger on a gun possession? Is it constructive or actual possession? I have doubts as to what the defendant said and what his version of this is, but, ultimately, it's the burden of proof by the State to prove beyond a reasonable doubt that the defendant possessed the bag that contains the firearm, that he possessed the firearm. *** Therefore, when I fall upon the burden of proof, although I don't necessarily believe the defendant, the burden is on the State to prove that the defendant possessed this firearm beyond a reasonable doubt, and I don't think that they have done it."

¶ 22    The sentencing hearing for the defendant's arson conviction took place on February 22, 2024, in front of the same judge who had presided over the defendant's bench trial. The State recommended a seven-year sentence, which was the maximum possible, because the "facts of this case [were] so far beyond the typical arson in terms of the threat and harm to innocent members of this community." In terms of aggravating factors, the defendant had six prior felony convictions, including residential burglary and unlawful possession of a weapon by a felon convictions. The defendant had been granted seven community-based sentences but had only successfully completed two, and had been granted five probational opportunities but had never succeeded there. The State argued that the defendant's conduct "threatened serious harm to every resident of those apartment complexes" as the fires were "right there at the edge of an occupied apartment building," with the bush fire in particular "effectively [blocking] some residents' ability to exit the building, if it had gone up in flames." On the firearm possession charge, which the defendant had been just acquitted of, the State asserted:

"No one conclusively saw the defendant carrying the bag where he was keeping a loaded gun. He was found not guilty, but that doesn't change the facts of this case. His DNA and prints were on that revolver. He had extra ammo in that caliber in his pocket. The evidence at trial was really clear proof that [the defendant] possessed that gun."

¶ 23    Defense counsel asked for a community-based sentence or the minimum imprisonment term of three years, arguing that although the defendant's adult criminal history did date back to 2004, all his convictions were nonviolent offenses. Counsel argued that the defendant "had

10

absolutely zero intention of harming anyone[,] causing *** any real kind of damage[,]" or [displacing] any families from their residence." Counsel also argued that the "door where the bush was burning was also not the only source of egress from that building." The defendant submitted a letter to the trial court, which the court characterized as one "feeling sorry about what happened, but not really denying to any great extent the potential harm that he caused."

¶ 24    The trial court noted that there was "very little mitigation" in the defendant's favor, except that "nobody was hurt" and there was "no allegation that he hurt anybody or had any intention of hurting anybody." In contrast, the court noted multiple aggravating factors, including the "facts and circumstances" of the case, which included "multiple fires in multiple locations," with some being "closer to the buildings." The court commented that, although the defendant may not have had any "intention to harm anybody, he certainly ran the very likely risk that he was [going to] cause damage to property and potentially could have harmed individuals."

¶ 25    The trial court also noted that the defendant "was found with the bag with ammunition which he shouldn't have [had] because he [was] a felon." The court pointed out the need for deterrence, and the defendant's prior records and history with the criminal justice system, including the fact that the defendant was on mandatory supervised release and parole at the time of this offense. The court commented that the defendant was "not being sentenced for any of these other offenses for which he was found not guilty, but [that the court was] considering the evidence from the trial." Although "there wasn't proof beyond a reasonable doubt [that the defendant] possessed the weapon or the bullets or anything else, [the court was] considering the evidence from the trial" as it was "relevant and *** reliable towards what happened on that particular day." The court sentenced the defendant to six and a half years in prison on his arson conviction and issued a corresponding written order the next day.

11

¶ 26    On March 12, 2024, the defendant filed a motion to reconsider sentence, or, in the alternative, for a new sentencing hearing. On April 5, 2024, the trial court held a hearing on the defendant's motion. Defense counsel asked the court to reduce the defendant's sentence to something closer to the minimum of three years or to probation. Counsel argued that "the court gave too much weight at sentencing to the charges that the court found [the defendant] not guilty of[,]" and to "some other things that could have damaged the building [but which ultimately] never happened." The State countered with its belief that the trial court had been "really more than fair with [the defendant] throughout" the proceedings, that the sentence was "appropriate in light of the facts and circumstances[,]" and that "the court did give appropriate consideration to the risk of serious harm that [the defendant's]conduct created here."

¶ 27    The trial court denied the defendant's motion, asserting that, although it had acquitted the defendant of all charges except arson, it was still "allowed to consider at sentencing the facts and circumstances of the entire event." The court explained that "[t]he fact that [it] found [the defendant] not guilty meant that the State didn't prove him guilty beyond a reasonable doubt necessarily of certain offenses[,]" not that the defendant "didn't conduct himself in a certain manner." The court concluded that "[t]hese were his actions." The court also defended its consideration of "what might have happened as opposed to what actually did happen," commenting that "[t]here is a statutory factor in aggravation regarding the threat of harm, not just actual harm that's caused here." The defendant appeals.

¶ 28                                   II. ANALYSIS

¶ 29    On appeal, the defendant argues that this court should either reduce his sentence or vacate the trial court's sentencing order and remand for resentencing proceedings where the trial court relied on improper sentencing factors, namely, the threat of harm posed by the defendant's arson

and the possession of firearm evidence presented at trial, in a way that was not insignificant. For the following reasons, we affirm.

¶ 30    Imposition of a sentence is normally within a trial court's discretion, and there is a strong presumption that the trial court based its sentencing determination on proper legal reasoning, such that the trial court's sentencing decision is reviewed with great deference. *People v. Abdelhadi*, 2012 IL App (2d) 111053, ¶ 8, (overruled by *People v. Johnson*, 2024 IL 130191, on other grounds); *People v. Alexander*, 239 Ill. 2d 205, 212-13 (2010). However, although the trial court has broad discretion when imposing a sentence, it may not consider improper factors, including factors implicit in the offense, as aggravating sentencing factors. *Abdelhadi*, 2012 IL App (2d) 111053, ¶ 9. The defendant bears the burden of establishing that a sentence was based on improper considerations. *Id.* Absent an affirmative showing of error, we must presume that the sentencing court knew and properly applied the law. *People ex rel. City of Chicago v. Le Mirage, Inc.*, 2013 IL App (1st) 093547, ¶ 136. The question of whether a trial court relied on an improper factor in imposing a sentence ultimately presents a question of law to be reviewed *de novo*. *Abdelhadi*, 2012 IL App (2d) 111053, ¶ 8; *People v. Morrow*, 2014 IL App (2d) 130718, ¶ 14. However, in determining whether the trial court based the sentence on proper factors, a reviewing court should consider the record as a whole rather than focusing on a few words or statements by the trial court. *Id*.

¶ 31    "A sentence based on improper factors will not be affirmed unless the reviewing court can determine from the record that the weight placed on the improperly considered aggravating factor was so insignificant that it did not lead to a greater sentence." *People v. Heider*, 231 Ill. 2d 1, 21 (2008). "Where a reviewing court is unable to determine what weight the trial court gave to an improper sentencing factor, the cause must be remanded for resentencing." *Le Mirage, Inc.*, 2013

13

IL App (1st) 093547, ¶ 136. "The length of a criminal defendant's sentence may be a factor in determining whether he received a greater sentence based on an improper aggravating factor." *Id.* ¶ 139. Here, the sentencing range for the defendant's arson conviction was between three and seven years' imprisonment, and the defendant received a sentence of six and one half years. See 730 ILCS 5/5-4.5-35(a) (West 2022).

¶ 32                                   A. Threat of Harm

¶ 33    The defendant first contends that the trial court improperly considered, as an aggravating sentencing factor, a factor implicit in the offense, *i.e.*, the threat of harm. We disagree.

¶ 34    It is true that a single factor cannot be used both as an element of an offense and as a basis for aggravating a defendant's sentence. *Abdelhadi*, 2012 IL App (2d) 111053, ¶ 9. Such dual use of a single factor is often referred to as a "double enhancement," and is prohibited since it is presumed that the legislature already considered the factor when setting the sentencing range for the offense. *Id.* However, "the commission of any offense, regardless of whether the offense itself deals with harm, can have varying degrees of harm or threatened harm." *People v. Saldivar*, 113 Ill. 2d 256, 269 (1986). "While the classification of a crime determines the sentencing range, the severity of the sentence depends upon the *degree of harm* caused *** and as such may be considered as an aggravating factor in determining the exact length of a particular sentence," even in cases where a 'threat of harm' is arguably implicit in the offense. (Emphasis in original.) *Id.*

¶ 35    Thus, the key questions for this court in reviewing this issue are (1) whether the 'threat of harm' is an element inherent to the offense of simple arson and (2) if so, whether the trial court's consideration of the threat of harm focused on the degree and gravity of the defendant's conduct or merely on the existence of the threat of harm itself.

14

¶ 36 At the outset, we note that 'threat of harm' is not explicitly listed as an element of arson. The statute criminalizing arson states only that:

> "(a) A person commits arson when, by means of fire or explosive, he or she knowingly:
> (1) Damages any real property, or any personal property having a value of $150 or more, of another without his or her consent; or
> (2) With intent to defraud an insurer, damages any property or any personal property having a value of $150 or more." 720 ILCS 5/20-1(a) (West 2022).

¶ 37 However, even accepting the defendant's argument that some threat of harm is definitionally inherent to all arson offenses, we do not find that the trial court's sentencing consideration of the threat of harm here was improper. The trial court did not consider the threat of harm that arson presents in general, but rather, considered the degree and gravity of harm that the defendant's specific conduct here posed. The court focused on the "facts and circumstances" of the case, which included "multiple fires in multiple locations," including some that were "closer to the [residential] buildings" where several individuals lived, and which could have greatly harmed the residents and their homes if the fires had not been successfully extinguished. The record also established that the fire department was called to the scene twice to extinguish the fires around the area, and that the bush fire was very near to one of the building's exits and could have blocked individuals' ability to escape if the situation had escalated. Thus, we find that the trial court's consideration of the 'threat of harm' posed by the defendant's case-specific actions in sentencing the defendant was not improper.

¶ 38 B. Possession of Firearm Trial Evidence

¶ 39 The defendant next contends that, at sentencing, the trial court improperly considered evidence presented as to firearm charges upon which he had been acquitted. Specifically, the defendant contends that the trial court's consideration of the firearm charge evidence was improper because (1) the trial court sentenced the defendant based on its belief that the defendant was guilty

of charges for which he had been acquitted and/or (2) the trial court acquitted the defendant of all charges except arson at trial because it found that the evidence relating to the other charges was insufficiently reliable in proving the conduct occurred. We disagree with both contentions, and address each in turn.

¶ 40    The defendant contends that the trial court's consideration of the firearm charge evidence was improper because the trial court sentenced the defendant based on a belief that he was guilty of charges for which he had been acquitted. The same trial court which sentenced the defendant also conducted the defendant's bench trial and acquitted him therein of the firearm charges. Further, when pronouncing its verdict at the bench trial, the trial court stated: "[A]lthough I don't necessarily believe the defendant, the burden is on the State to prove that the defendant possessed this firearm beyond a reasonable doubt, and I don't think that they have done it." Additionally, the court explained that the defendant was "not being sentenced for any of these other offenses for which he was found not guilty, but [that the court was] considering the evidence from the trial."

¶ 41    The defendant further contends that because the trial court acquitted the defendant of all charges except arson, it found that the evidence relating to the other charges was insufficiently reliable in proving the conduct occurred, and such evidence was thus improperly considered at sentencing.

¶ 42    There are clear differences between the evidentiary standard required at trial and that required at sentencing. *People v. Jackson*, 149 Ill. 2d 540, 547 (1992). The burden of proof at sentencing is "lower than proof beyond a reasonable doubt[,]" and is in fact closer to "a preponderance of the evidence standard." *Id*. at 549. Therefore, "[u]nlike in the guilt-innocence phase of trial, a sentencing court may: ' "search anywhere, within reasonable bounds, for other facts which tend to aggravate or mitigate the offense." ' " *Jackson*, 149 Ill. 2d at 548 (quoting

16

*People v. Adkins*, 41 Ill. 2d 297, 301 (1968), quoting People v. McWilliams, 348 Ill. 333, 336 (1932)). "It is well established that 'evidence of criminal conduct can be considered at sentencing even if the defendant previously had been acquitted of that conduct.' " *People v. Deleon*, 227 Ill. 2d 332, 340 (2008) (quoting *Jackson*, 149 Ill. 2d at 549-50). This is because acquittal does not demonstrate a defendant's innocence; it only means that the prosecution was unable to prove the defendant guilty beyond a reasonable doubt at trial. *Le Mirage, Inc.*, 2013 IL App (1st) 093547, ¶ 134. "Acquittal therefore does not bar presentation of those facts at sentencing, where the burden of proof is lower." *Id.*; see *Jackson*, 149 Ill. 2d at 550-51.

¶ 43    Despite the wide latitude given in the evidence they may review, sentencing courts must still " 'exercise care to insure the accuracy of information considered and to shield [themselves] from what might be the prejudicial effect of improper materials.' " *Jackson*, 149 Ill. 2d at 549 (quoting *Adkins*, 41 Ill. 2d at 300). While no specific burden of proof at sentencing has been prescribed, our supreme court "has consistently stated that relevance and reliability are the important factors in the consideration of evidence at sentencing." *Id*. Additionally, specifically regarding evidence of "criminal conduct for which there has been no prosecution or conviction," such evidence "should be presented by witnesses who can be confronted and cross-examined, *** and the defendant should have an opportunity to rebut the testimony." *Id.* at 548. So long as these standards are met, a sentencing court is "fully entitled" to take evidence of criminal conduct which defendant has been acquitted of into account when fashioning defendant's sentences. *Deleon*, 227 Ill. 2d at 340.

¶ 44    Here, the trial evidence regarding the charges for which the defendant was acquitted are relevant, as all charges arose out of the same incident. The evidence was also presented by witnesses who were subject to cross-examination at trial, and the defendant testified on his own

behalf. As to reliability, the court emphasized that the defendant's acquittals were more due to the fact that the State had not met its burden to prove the charges beyond a reasonable doubt rather than because of the unreliability of the evidence presented. In issuing its verdict acquitting the defendant of the firearm charges, the court stated:

> "I have doubts as to what the defendant said and what his version of this is, but, ultimately, it's the burden of proof by the State to prove beyond a reasonable doubt that the defendant possessed the bag that contains the firearm, that he possessed the firearm. *** Therefore, when I fall upon the burden of proof, although I don't necessarily believe the defendant, the burden is on the State to prove that the defendant possessed this firearm *beyond a reasonable doubt*, and I don't think that they have done it." (Emphasis added.)

The trial court expressed its belief that the police officers who had testified at trial were all "telling the truth," and characterized the defendant's testimony as "a little unbelievable." At the sentencing hearing, the trial court commented that although "there wasn't proof beyond a reasonable doubt [that the defendant] possessed the weapon or the bullets or anything else, [it was] considering the evidence from the trial" because it was "relevant and *** reliable towards what happened." At the motion to reconsider sentence hearing, the court again stated that, despite acquitting the defendant of all charges save arson, it was still "allowed to consider at sentencing the facts and circumstances of the entire event." The court reaffirmed that "[t]he fact that [it] found [the defendant] not guilty meant that the State didn't prove him guilty beyond a reasonable doubt[,]" not that the defendant "didn't conduct himself in a certain manner."

¶ 45   Thus, we find that the court's consideration at sentencing of evidence presented on charges upon which the defendant was acquitted in this case was not improper.

¶ 46                                    III. CONCLUSION

¶ 47   For the above reasons, we affirm the trial court's order sentencing the defendant to six and one half years of incarceration as to his arson conviction.

18

¶ 48    Affirmed.